**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS-WESTERN DIVISION**

| | | |
|---|---|---|
| ROCKFORD PARK DISTRICT, an Illinois Unit of Local Government, | ) ) ) | FILED: MAY 8, 2008<br>08CV2676   EDA<br>JUDGE HOLDERMAN |
| Plaintiff, | ) ) | MAGISTRATE JUDGE BROWN |
| vs. | ) ) | No. |
| TIG INSURANCE COMPANY, as successor by merger to INTERNATIONAL INSURANCE COMPANY, a foreign corporation, Defendant. | ) ) ) ) | Judge:<br><br>JURY TRIAL DEMANDED |

## NOTICE OF REMOVAL

Defendant TIG INSURANCE COMPANY, as successor by merger to INTER-

NATIONAL INSURANCE COMPANY, a foreign corporation, ("TIG") by and through its

undersigned attorneys, pursuant to 28 U.S.C. § 1446, 28 U.S.C. §1332(a) and 28 U.S.C. § 1441,

*et. seq.*, hereby submits its Notice of Removal of this action from the Circuit Court of the 17th

Judicial Circuit, County of Winnebago, Illinois, Case No. 08 MR 175, to the United States

District Court for the Northern District of Illinois, Western Division, the judicial district in which

this matter is pending.  In support thereof, TIG states as follows:

1.      TIG is the only defendant in the lawsuit currently pending in the Circuit Court of

the 17th Judicial Circuit, County of Winnebago, Illinois entitled *ROCKFORD PARK DISTRICT,*

*an Illinois Unit of Local Government v. TIG INSURANCE COMPANY, as successor by merger to*

*INTERNATIONAL INSURANCE COMPANY, a foreign corporation*, Case No. 08 MR175.

2.      In accordance with 28 U.S.C. §1446 (a), TIG attaches as Exhibit "1" a true and

complete copy of the state court file maintained in the 17th Judicial Circuit, County of

Winnebago, Illinois, for Case No. 08 MR175, which includes all process, and pleadings served upon TIG.

3.      At all material times, Defendant, TIG INSURANCE COMPANY, as successor by merger to INTERNATIONAL INSURANCE COMPANY, a foreign corporation, is a corporation organized under the laws of the State of California with its principal place of business located in Manchester, New Hampshire.

4.      Plaintiff, an Illinois Unit of Government, organized and existing under the laws of the State of Illinois and has its principal place of business in Illinois.

5.      This lawsuit does not constitute a "direct action" within the meaning of 28 U.S.C. §1332(c)(1).

6.      There is complete diversity of the parties.

7.      Plaintiff's petition seeks damages in excess of $75,000, to wit, monetary judgment in excess of $50,000, other damages that the Plaintiff will incur, pre and post judgment interest, attorneys' fees, litigation costs and expenses incurred, statutory penalty, attorneys' fees and all costs and expenses allowable under 215 ILCS 5/155.

8.      By virtue of the above, this Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1332 (a).  Removal to this Court of Plaintiff's action is authorized by 28 U.S.C. §1441(a).

9.      Upon information and belief, the Director of Insurance of Illinois was served on April 28, 2008.  This Notice of Removal is filed within thirty (30) days of service of Plaintiff's Complaint on TIG and is therefore timely pursuant to 28 U.S.C. §1446.

2

10.   Pursuant to 28 U.S.C.§1446 (d), a copy of this Notice is being served on Plaintiff and filed with the 17th Judicial Circuit, County of Winnebago, Illinois.

WHEREFORE, Defendant, TIG INSURANCE COMPANY, as successor by merger to INTERNATIONAL INSURANCE COMPANY, a foreign corporation, respectfully gives notice that the above-entitled cause be removed from the 17th Judicial Circuit, County of Winnebago, Illinois, to the United States District Court for the Northern District of Illinois, Western Division.

/s/ Ilene M. Korey
Ilene M. Korey  #6185645
CLAUSEN MILLER P.C.

MARGARET J. ORBON
ILENE M. KOREY
CLAUSEN MILLER P.C.
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010

Attorneys for Defendant TIG INSURANCE COMPANY

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct cop of the foregoing has been served upon the following counsel by certified mail, postage prepaid, this 8th of May, 2008.

Marc C. Gravino
WILLIAMS MCCARTHY, LLP
120 West State Street
P. O. Box 219
Rockford, IL  61105-0219
*Attorneys for Plaintiff*

/s/ Ilene M. Korey
Attorney

3

1182137.1

# EXHIBIT 1

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
COUNTY OF WINNEBAGO

ROCKFORD PARK DISTRICT, an Illinois )
Unit of Local Government, )
                        )
           Plaintiff. )
       vs. )
                        )     Case No.: 08 MR 175
                        )
TIG INSURANCE COMPANY, as successor )
by merger to INTERNATIONAL )     **SUMMONS**
INSURANCE COMPANY, a foreign )
insurance corporation, )
                        )
           Defendant. )

**COPY**

To:    TIG Insurance Company as successor by merger to International Insurance Company
c/o Michael T. McRaith, Director of Insurance, 320 West Washington Street,
Springfield, IL 62767

      You are summoned and required to file an answer in this case, or otherwise file your
appearance in the Office of the Clerk of this Court, Winnebago County Courthouse, 400
West State Street, Rockford, Illinois, within 30 days after service of this summons, not
counting the day of service. IF YOU FAIL TO DO SO, A JUDGMENT OR DECREE BY
DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE
COMPLAINT.

To the officer:

      This summons must be returned by the officer or other person to whom it was given
for service, with indorsement of service and fees, if any, immediately after service. If service
cannot be made, summons shall be returned so indorsed.

      This summons may not be served later than 30 days after its date.

Witness    **APR 2 3 2008** , 2008

*Thomas A Klein*
(Clerk of the Circuit Court)

By *Martha Omaus Hernandez*
            (Deputy)

*[Seal of Court]*

(Plaintiff's Attorney or Plaintiff if he is not represented by an Attorney)

Name:        Marc C. Gravino, #850
Attorney for: Plaintiff
Address:     P.O. Box 219
City:          Rockford, IL 61105-0219
Telephone:  815/987-8958

Summons.wpd                        -1-

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
COUNTY OF WINNEBAGO

**FILED**

Date: 3/19/08

*Thomas A. Klein*
Clerk of the Circuit Court
By _____ Deputy
Winnebago County, IL

| | |
|---|---|
| ROCKFORD PARK DISTRICT, an Illinois Unit of Local Government, | ) ) ) |
| Plaintiff. | ) ) |
| vs. | ) ) |
| TIG INSURANCE COMPANY, as successor by merger to INTERNATIONAL INSURANCE COMPANY, a foreign insurance corporation, | ) ) ) ) ) |
| Defendant. | ) ) ) |

Case No.: 08 MR 175

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff, the ROCKFORD PARK DISTRICT, an Illinois local unit of municipal government, by its attorneys WilliamsMcCarthy LLP and for its Complaint for Declaratory and Other Relief against defendant, TIG Insurance Company as successor by merger to International Insurance Company (hereinafter "International"), states as follows:

### OVERVIEW OF THE ROCKFORD PARK DISTRICT'S CLAIMS

1.    In this action, the Rockford Park District ("the Park District"), asserts the following claims against International:

(a)    a claim for declaratory relief that International is obligated to indemnify the Park District with respect to the matters in the complaint filed against the Park District by the State of Illinois on December 28, 2005, alleging that the Park District is legally required to pay the cost of remediating alleged contamination with respect to the Park District property located at 1401 E.

Complaint.01.wpd

-1-

Riverside Blvd. in Loves Park, Winnebago County, Illinois ("the Sand Park Site") and the costs of monitoring the environmental conditions at the Sand Park Site after remediation, as well as indemnify the Park District for certain related costs and expenses incurred by the Rockford Park District with respect to the Sand Park Site; and

(b)     a claim for declaratory relief that the facts and circumstances in this case trigger two or more occurrences under the International policy for purposes of determining the liability limits of International's indemnity obligation, where the subject insurance policy indemnity limits are $1.0 million per "occurrence" with no aggregate indemnity limits.

2.     In addition, as part of its claim for declaratory relief and other relief, the Park District seeks a monetary judgment against International for its legally assessed share of the remedial costs associated with the Sand Park Site, as well as any other insurance coverage relief deemed appropriate.

<u>THE PARTIES</u>

3.     The Park District is an Illinois local unit of municipal government with its principal place of business in Rockford, Illinois. The Park District was and is organized for the purpose of providing a structure for the local community to establish and maintain public park and recreation systems that provide for the health, well-being, and entertainment of its citizens.

4.     At all times relevant to this litigation, International was a corporation in the business of issuing policies of insurance, and at all relevant times was and is doing business in Illinois. International Insurance Company was, on information and belief, merged into TIG Insurance

Company on or about December 16, 2002, which was after the issuance of the subject insurance policy.

### THE CGL / UMBRELLA INSURANCE COVERAGE ISSUED BY INTERNATIONAL

5.    In return for the payment of premiums by the Park District and other valuable consideration, International issued at least one primary policy of insurance to the Park District, policy no. 500205228, which provided comprehensive general liability ("CGL") insurance coverage, including but not limited to coverage for occurrences during the policy period that caused property damage.  (This CGL policy, a true and correct copy of which is attached hereto as **Exhibit A**, is hereinafter referred to as the "Policy").  In addition, on information and belief, International issued at least one excess / umbrella liability policy to the Park District, as policy no. 5220537453, with limits of $10,000,000, as shown by a June 21, 1985 Certificate of Insurance, a true and correct copy of which is attached hereto as **Exhibit B**.  (This excess / umbrella policy is hereinafter referred to as the "Umbrella Policy").

6.    In addition to other obligations on the part of International, the Policy contains an obligation on the part of International to defend and indemnify the Park District for all losses which the Park District becomes legally obligated to pay because of bodily injury or property damage caused by occurrences; and as detailed below, International has agreed to participate in the Park District's defense in the underlying action, under a reservation of rights, by paying for a portion of the Park District's defense fees and expenses in the underlying action under a defense cost sharing arrangement with another of the Park District's liability carriers.

7.    In addition to the other obligations on the part of International, on information and belief, the Umbrella Policy by its terms or by operation of law contains an obligation on the part of

International to indemnify the Park District for certain losses as defined therein, which the insured shall become legally obligated to pay as damages because of personal injury and property damage caused by occurrences (or language substantially to that effect).  In addition, on information and belief, the Umbrella policy provides for certain "drop down" coverage by its terms or by operation of law in the event the respective underlying policy or policies provide no coverage to the insured for a given occurrence, or language substantially to that effect, because of insolvency or other circumstances.   The carrier that issued an underlying policy to the Umbrella Policy, Integrity Insurance Company, filed for receivership several years ago and is unable to fund its coverage obligations to the Park District.

8.     The Park District has substantially performed all of its obligations under the above-referenced policies issued by International.

### THE CURRENT COVERAGE DISPUTE

9.     Although International has agreed pursuant to the terms of the Policy to contribute to the cost of the Park District's defense in the underlying suit with another carrier, under a reservation of certain of its rights to disclaim an indemnity obligation at a later date if appropriate, as alleged above, it has recently maintained in the claim process that the facts and circumstances presented in the underlying suit limit its potential indemnity liability (including defense fees) to a maximum of $1.0 million under the Policy; and it has recently denied the existence of the Umbrella Policy; whereas the Park District maintains that the facts and circumstances of the underlying suit trigger multiple occurrences that are subject to indemnity under the Policy and Umbrella Policy, and that International's indemnity obligation is thus not limited to $1.0 million.   Accordingly, there is an actual and justiciable controversy between the Park District and International as to whether the

Policy or the Umbrella Policy provide indemnity with respect to the Sand Park matter, and whether the indemnity limits are capped at $1.0 million.

## THE BACKGROUND OF THE SAND PARK SITE

10.    From approximately 1941 to date, the Park District has owned the Sand Park Site, consisting of approximately 41 acres of real property located at at1401 E. Riverside Blvd. in Loves Park, Winnebago County, Illinois, and commonly known as "Sand Park."

11.    On information and belief, and commencing at an unknown time which the Park District, despite substantial and repeated efforts and investigation, has been and continues to be unable to determine, the majority of Sand Park was used as a municipal landfill for the refuse disposal needs of the people of the City of Loves Park.

12.    Use of Sand Park as the Loves Park municipal landfill came about, on information and belief, pursuant to discussions between the then incumbent executive director of the Park District, one Earl Elliott, since deceased, and the then incumbent major of the City of Loves Park, one Dan Timmis.

13.    The use of Sand Park as the municipal landfill for the City of Loves Park is believed to have commenced in the early 1950's, although the specific time period is currently unknown to the Park District.

14.    From the beginning of the period of the use of Sand Park as a municipal landfill for the City of Loves Park, until such use was terminated in or about 1972, and at all times during such period, Sand Park was, on information and belief, made available by the Park District and the City of Loves Park on a gratuitous basis, pursuant to a verbal "handshake" agreement, at no cost to the City of Loves Park and for no income or charges payable to the Park District.

Complaint.01.wpd

5

15.    From approximately the early / mid 1950's until approximately 1972, the Sand Park Site on information and belief was operated as a municipal landfill by, among other companies, Browning Ferris Industries, Inc. and earlier, Rockford Disposal, Inc. Currently, the Sand Park Site is not being used as a municipal landfill or for any other disposal purpose, and is a closed landfill. However, the site continues to contain all municipal and other waste therein disposed during the period of active operation as such landfill. Portions of the Sand Park Site are presently maintained and operated by the Park District as a swimming pool and recreational area, and as a memorial park area, pending commencement of the remediation and monitoring as required by the State of Illinois as detailed below.

16.    From some point in the 1970's into at least the mid to late 1980's, or later, on information and belief, the Illinois Environmental Protection Agency ("IEPA") conducted investigations both of records and of the Sand Park physical site itself relative to, and on information and belief relative only to, the question of proper closure of a site formerly used as a landfill, particularly with respect to the creation and placement of a proper "cover" or layer of clean topsoil, with subsequently grown turf or other appropriate vegetative matter, over and atop the portions of Sand Park previously used as such landfill.

17.    Such above-described investigative activities of the IEPA did not, and were not reasonably expected to, notify the Park District that the Sand Park site had been determined to be the source of regulated contaminants that threatened or impacted the ground water beneath the Sand Park Site.

18.    Although unknown to the Park District until approximately 2004 after various studies were conducted, at various times during the Park District's ownership of the Sand Park Site,

including during each of the policy periods of the Policy and the Umbrella Policy, on information and belief, one or more sudden and accidental occurrences took place whereby various substances were suddenly and accidentally released into the soil at and around the Sand Park Site, which substances included contaminants that the State of Illinois is now requiring the Park District to remediate, as detailed below.

19.     The IEPA and the EPA conducted various investigations into the source of certain contaminants in the neighboring industrial areas at or near the Sand Park Site, in Loves Park, Illinois in the 1980's and thereafter, during which period the known source or sources remained unknown.

20.     For several decades after the initial investigations, the evidence compiled by the IEPA and EPA, including hydro geologic studies commissioned by the IEPA and EPA, suggested that the probable sources of the contaminants were various industrial facilities in the areas surrounding the Sand Park Site, rather than the Sand Park Site itself; because of a number of hydro geological factors that tended to rule out the Sand Park Site as a probable source of the contamination.

21.     In February, 2001, the State of Illinois sought reimbursement from the Park District for the costs incurred in conducting various studies with respect to the Sand Park Site, and demanded payment of approximately $117,000 from the Park District in order to settle the disputed matter regarding that Site.

22.     In or about 2002, the Park District paid the claimed sum of about $117,000 to the State of Illinois in two respective installments, after the State of Illinois threatened suit, and in response to the State of Illinois' letter which advised that "settlement in the [Park District's] case" would be effected by the payment of that sum to the State of Illinois by the Park District.

23.    During the 2001 and 2002 time period, the Illinois Department of Public Health conducted a Comprehensive Public Health Assessment of the Sand Park Site, and ultimately concluded in a written report entitled, *Public Health Assessment* dated March 14, 2002., that the "current exposures are not at levels expected to cause adverse health effects; thus, the groundwater at Sand Park site poses no apparent public health hazard."

24.    Notwithstanding this Public Health Assessment in 2002, and notwithstanding its 2002 settlement with the Park District as set forth in paragraphs 21-22 above, on information and belief, the State of Illinois continued to investigate the areas at and around the Sand Park Site in 2002 and 2003, and advised the Park District in various discussions in 2004 of its conclusion at that time that the Sand Park Site was not merely in the path of various contaminants emanating from the surrounding area, but that the Sand Park Site was a likely source of at least some of those contaminants.

25.    Over the period of 2003 - 2004, the Park District conducted its own evaluation of the available environmental data, and continued to review additional information from the IEPA as it was developed and made available, to attempt to determine the nature and possible source(s) of the contamination.

26.    Because of the continued investigative activities in 2003 and 2004 by the State of Illinois following its 2002 settlement with the State, on about November 10, 2004, the Park District notified International by letter that, notwithstanding the State of Illinois' settlement with the Park District regarding the Sand Park Site, the State was considering an action against the Park District to compel remediation of the Sand Park Site, and that the Rockford Park District was seeking defense and indemnity from International with respect to this potential suit by the State of Illinois.

27.     On or about April 26, 2005 after exchanging initial correspondence with the Park District, International responded with a letter indicating among other things that it: a) consented to the Park District entering into a Consent Order with the State of Illinois with respect to remediation of the Sand Park Site; b) would investigate the matter before making a coverage determination; and c) would reserve its rights during its investigation.

28.     From April 2005 through December 2005, the Park District cooperated with International in providing information and records relating to the Sand Park Site.

29.     On December 28, 2005, the State of Illinois filed a Complaint against the Park District in the 17th Judicial Circuit Court, Winnebago County, Illinois, as case no. 05 MR 452, seeking to hold the Park District responsible for the costs associated with the remediation of contaminants at the Sand Park Site and post remedial monitoring, as alleged in that suit.  A true and correct copy of the Complaint in that suit (referred to herein as the Underlying Suit or Underlying Action) is attached hereto as **Exhibit C**, and is incorporated herein by reference.  A true and correct copy on the Amended Complaint filed in the Underlying Action on September 12, 2007 is attached hereto as **Exhibit D**.

30.     On January 14, 2006, within a few days of being served in the Underlying Suit, the Park District: a) notified International in writing (through its counsel) that the State of Illinois had filed the Underlying Suit against the Park District; b) provided International with a copy of that suit; and c) and sought defense and indemnity from International with respect to that suit / claim.

31.     In a March 17, 2006 claim letter, International: a) acknowledged the Park District's tender of the defense and indemnity of the Underlying Suit; b) agreed to provide a defense to the Park District under a reservation of rights; and c) advised the Park District that it would investigate

the claim to determine whether it had any indemnity obligations to the Park District.

32.     Over the next two years, from March 2006 to the present, the Park District has provided additional information to International as it has been developed and discovered, and International has continued its investigation of the claim and its indemnity obligations.

33.     At the present time, International is defending the Park District in the Underlying Suit by agreeing to defense cost-share with another of the Park District's liability carriers, and has paid certain of the defense fees and expenses.  However, International currently asserts that under certain circumstances it may not have an obligation to indemnify or fully indemnify the Park District in the Underlying Suit, and that its indemnity obligation if any is limited to a single occurrence limit of $1.0 million under the Policy.

### THE ROCKFORD PARK DISTRICT'S
### ALLEGED LEGAL OBLIGATION TO REMEDIATE CONTAMINATION

34.     According to the State of Illinois in the Underlying Suit, the Park District is legally obligated to remediate various contaminants at the Sand Park Site, pursuant to various environmental laws, regulations and the IEPA's directives.

35.     To date, the Park District has expended significant sums to investigate the Sand Park matter, and to defend its interests in the Underlying Suit,  and will be legally obligated to expend significant sums in the future to defend against the claims in the Underlying Suit.

### INTERNATIONAL'S COVERAGE POSITION

36.     As alleged above, on or about November 10, 2004, the Park District notified International of a potential suit, in that the State of Illinois had asserted that the Park District was responsible for the costs of investigating and remediating alleged violations of various environmental laws at the Sand Park Site, and had threatened suit against the Park District; and the Park District

Complaint.01.wpd

sought defense and indemnity from International against such potential litigation.

37.    As alleged above, on or about January 14, 2006, the Park District notified International that the State of Illinois had filed suit against the Park District in December 2005, and requested that International provide the Park District with a defense to the State of Illinois' lawsuit and that it indemnify the Park District from any judgment entered against the Park District in that suit.

38.    As indicated above, although International has agreed to provide a defense under a reservation of rights, the parties have an actual and justiciable controversy as to International's indemnity obligations.

## COUNT I

### (The Park District vs. International – Declaratory Relief)

39.    The Park District incorporates and realleges paragraphs 1 through 38 above as paragraph 39 of this Count as if fully set forth herein.

40.    International issued a primary CGL policy to the Park District as alleged above.

41.    In addition to the CGL policy referenced in paragraph 40, above, on information and belief, International issued other CGL coverage to the Park District that has not yet been located, despite the Park District's due diligence in attempting to do so. On information and belief, that yet to be located policy or policies have substantially the same coverage terms and conditions as the identified CGL policy. These yet to be located policies are referred to herein as the "Lost Policies".

42.    The Policy and the Lost Policies provide coverage for the Underlying Action and any legally required remediation because, among other things, the State of Illinois has alleged that the Park District is legally obligated to pay for various property damage and threats to groundwater

Complaint.01.wpd

11

resulting from occurrences during the applicable policy periods and because the State of Illinois has filed suit against the Park District seeking monetary damages on account of such damage to property and threats to groundwater.

WHEREFORE, the Rockford Park District respectfully prays that this Court enter judgment in its favor against International as follows:

A. Declaring and finding that, under one or more of the International policies described above, International is obligated to indemnify its insured the Park District against the claims being asserted by the State of Illinois in the lawsuit filed against the Park District by the State of Illinois, and for all legally required remediation and monitoring activity, and that it is obligated to reimburse the Park District for all post-notice costs it has incurred and will incur relating to its investigation, monitoring and clean-up of the Sand Park Site, and, based on such declaratory judgment, enter monetary judgment in the Park District's favor and against International in an amount in excess of $50,000, as the proofs may show, and such other damages that the Park District will incur, plus pre and post-judgment interest;

B. Awarding the Park District its attorneys' fees, litigation costs and expenses incurred herein;

C. Awarding all damages allowable under 215 ILCS 5/155, including a statutory penalty, attorneys' fees and all costs and expenses, if the court determines that International's claim position is unreasonable

and vexatious under current law, or that it otherwise acted in bad faith

with regard to its insured; and

D.　　Granting the Park District such other and further declaratory and

monetary relief that this Court deems just and proper.

## THE ROCKFORD PARK DISTRICT DEMANDS TRIAL BY JURY

## AS TO ALL ISSUES SO TRIABLE

THE ROCKFORD PARK DISTRICT, an
Illinois Unit of Local Government, Counter-
Plaintiff,

By:　　WILLIAMSMcCARTHY LLP

By:　　　　　　　　　　　　　　　
　　　　　　　　Marc C. Gravino

Marc C. Gravino, Esq. (#850)
WilliamsMcCarthy LLP
P.O. Box 219
Rockford, IL 61105-0219
(815) 987-8900

**Declarations**

# COMPAC II

| Item | RENEWAL OF | New | DATE ISSUED 3-20-84 JM | Policy No. 500 205228 3 |

**1.**

Named Insured **Park District Risk Management Association**
and P. O. Address **225 Prospect Avenue**
(Number, Street, Town, County, State & Zip No.) **Elmhurst, Illinois 60126**

**2.** Policy Period: 12:01 A.M. STANDARD TIME AT LOCATION OF DESIGNATED PREMISES. From: **1-1-84** To: **1-1-87**

THIS INSURANCE POLICY IS ISSUED BY

☐ UNITED STATES FIRE INSURANCE COMPANY
☐ THE NORTH RIVER INSURANCE COMPANY
☐ WESTCHESTER FIRE INSURANCE COMPANY
☒ INTERNATIONAL INSURANCE COMPANY

REPRESENTATIVE:

Agent or Broker **International Special Risk Services**
Office Address **10 Gould Center**
Town, State & Zip **Rolling Meadows, Illinois 60008**

**3.** Location of Designated Premises (Enter "Same" if same location as above)    Occupancy of Premises

1.
**As per schedule on file with this company**
2.

☐ Multiple buildings or premises as designated on Supplemental Declarations attached.

**4. LOC. NO.**

Insurance is provided with respect to the designated premises and with respect to those coverages and kinds of property for which a specific limit of liability is shown, subject to all of the terms of this policy including forms and endorsements made a part hereof.

| SECTION I—PROPERTY COVERAGE | Coinsurance Percentage | LIMIT OF LIABILITY | DEDUCTIBLE | Coverages made part of this Policy at time of issue: (Insert No. and Edition Date) |
|---|---|---|---|---|
| **As per Form GP0001 (4-83)** | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

SECTION I COVERAGES (Insert No. and Edition Date)

**GP0001 (4-83) Endorsements 1, 2, 3 and 4**

MORTGAGEE (NAME AND ADDRESS)

| SECTION II—LIABILITY COVERAGE | **As per Form GP0001** LIMIT OF LIABILITY |
|---|---|
| Bodily Injury and Property Damage Liability | $ **(4-83)** each occurrence $ aggregate |
| Premises Medical Payments | $ each person $ each accident |

PERSONAL INJURY LIABILITY INSURANCE    Groups of Offenses        Limits of Liability:

☐ A. False Arrest, Detention or Imprisonment, or Malicious Prosecution
☐ B. Libel, Slander, Defamation or Violation of Right of Privacy        $ each person aggregate;
☐ C. Wrongful Entry or Eviction or Other Invasion of Right of Private Occupancy    $ general aggregate.
☐ D.        Insured's participation _____ %

SECTION II COVERAGES (Insert No. and Edition Date)

**GP0001 (4-83) Endorsements 1, 2, 3 and 4**

SECTION III and SECTION IV COVERAGES (Insert No. and Edition Date)

**GP0001 (4-83) Endorsements 1, 2, 3 and 4**

**5.**

| TOTAL ADVANCE PREMIUM | IF PAID IN ANNUAL INSTALLMENTS, PREMIUM DUE: |
|---|---|
| $ **$ 305,000.** | AT INCEPTION $ **TBD**   1st ANNIVERSARY $ **TBD**   2nd ANNIVERSARY |

Unless indicated by an X in the box below as "NOT APPLICABLE", the premium for installments subsequent to the initial installment shall be subject to adjustment on the basis of the rates in effect at each anniversary date. ☐ NOT APPLICABLE

Audit Period: Annual, unless otherwise stated:    ☐ Monthly    ☐ Quarterly    ☐ Semi-Annual    ☐ (Other) _____

COUNTERSIGNATURE DATE                COUNTERSIGNATURE OF AUTHORIZED AGENT

FM.600.0.272 (5-77)            **COMPANY COPY**



EXHIBIT

A



# INSURANCE BINDER

THIS BINDER IS A TEMPORARY INSURANCE CONTRACT, SUBJECT
TO THE CONDITIONS SHOWN ON THE REVERSE SIDE OF THIS FORM.

**NAME AND ADDRESS OF AGENCY**

ARTHUR J. GALLAGHER & CO.
10 Gould Center, Golf Road
Rolling Meadows, Illinois 60008

**COMPANY**
International Surplus Line Corporation

Effective 12:01 am December 1 , 19 83
Expires 12:01 am January 1 , 19 84

☐ This binder is issued to extend coverage in the above
named company per existing policy # ( EXCEPT AS NOTED BELOW )

**Description of Operation/Vehicles/Property**

Parks and Recreation

**NAME AND MAILING ADDRESS OF INSURED**

Elk Grove Park District
499 Biesterfield Rd.
Elk Grove Village, IL 60007

| **P R O P E R T Y** | Type and Location of Property | Coverage/Perils/Forms | Amt of Insurance | Ded. | Coins. % |
|---|---|---|---|---|---|
| | Various - Per Attached Schedule 3,977,862 @ 90% | All Risk, Agreed Amount, Replacement Cost. | 3,977,862 | 250 | 90% |
| | -Blanket Building & Contents | | $1,500 In | | |
| | -Money & Securities | | $1,500 out $2,500 | | |
| | -Employee Blanket Bond | | $245,105 | 50 | |
| | -Inland Marine-Schedule Attached | | | | |

| **L I A B I L I T Y** | Type of Insurance | Coverage/Forms | Limits of Liability | Each Occurrence | Aggregate |
|---|---|---|---|---|---|
| | ☐ Scheduled Form  ☒ Comprehensive Form | | Bodily Injury | $ | |
| | ☒ Premises/Operations | | Property Damage | $ | $ |
| | ☒ Products/Completed Operations | | Bodily Injury & Property Damage Combined | $500,000 | $500,000 |
| | ☒ Contractual | ☒A ☐B ☒C | Personal Injury | | $500,000 |
| | ☐ Other (specify below) | | | | |
| | ☐ Med. Pay. $ PER PERSON $ PER ACCIDENT | | | | |
| | ☒ Personal Injury | | | | |

| **A U T O M O B I L E** | | | Limits of Liability | | |
|---|---|---|---|---|---|
| | ☒ Liability  ☒ Non-owned  ☒ Hired | | Bodily Injury (Each Person) | $ | |
| | ☒ Comprehensive-Deductible $ACV | | Bodily Injury (Each Occurrence) | $ | |
| | ☒ Collision-Deductible $50 | | Property Damage | $ | |
| | ☒ Medical Payments $2,000 | | | | |
| | ☒ Uninsured Motorist $30,000 | | Bodily Injury & Property Damage Combined | $500,000 | |
| | ☐ No Fault (specify): | | | | |
| | ☐ Other (specify): | | | | |

☐ WORKERS' COMPENSATION — Statutory Limits (specify states below)    ☐ EMPLOYERS' LIABILITY — Limit  $

**SPECIAL CONDITIONS/OTHER COVERAGES**  Independent Contractors, Fire Legal Liability
$50,000,000.

**NAME AND ADDRESS OF** ☐ MORTGAGEE  ☐ LOSS PAYEE  ☐ ADD'L INSURED

LOAN NUMBER

Account Executive, John A. Durkin

_S. R. Dannello_

Signature of Authorized Representative    11/29/8
Date

## NOTICE OF CANCELLATION

Date Nov. 15, 1985

Please take notice that under and pursuant to the terms and provisions of its Policy No. 180 205 228 1

International _____ Insurance Company hereby

elects to and does cancel the said policy and any and all endorsements and/or renewal certificates relating thereto, the said cancellation to become effective as of __12:01 AM__ of the __1__ day of __January__ 19 86 Standard time.
(HOUR)

The pro rata unearned premium, if premium has been paid, will be refunded on demand.

If the premium has not been paid, a bill for the earned premium to the date of cancellation will be forwarded in due course.

Park District Risk Management Assoc.
225 Prospect Ave.
Elmhurst, IL  60216

*S R Casselli*
Authorized Representative

NOV 2 6 1985

ADDITIONAL INTERESTS WHO ARE RECEIVING COPIES
OF THIS NOTICE:

Arthur J. Gallagher & Co.
10 Gould Center
Rolling Meadows, IL  60008

Attn:  John Durkin

 Crum and Forster
organizations

FM. 100.0.42 (8-80)  PTG. 12/83

SERVICE OFFICE COPY

ARTHUR J. GALLAGHER PACK.

## COMBINED PROPERTY, CASUALTY AND CRIME INSURANCE

This Insurance provides the following -

| | | |
|---|---|---|
| **SECTION I** | – | **PROPERTY INSURANCE** |
| AGREEMENT A | – | BUILDING AND CONTENTS |
| AGREEMENT B | – | AUTOMOBILE |
| **SECTION II** | – | **CASUALTY INSURANCE** |
| AGREEMENT C | – | GENERAL LIABILITY |
| AGREEMENT D | – | LIQUOR LIABILITY |
| AGREEMENT E | – | AUTOMOBILE LIABILITY |
| AGREEMENT F | – | EMPLOYEE BENEFIT LIABILITY |
| **SECTION III** | – | **CRIME INSURANCE** |
| AGREEMENT G | – | MONEY AND SECURITIES  (WITHIN PREMISES) |
| AGREEMENT H | – | MONEY AND SECURITIES (OUTSIDE PREMISES) |
| AGREEMENT I | – | COMMERCIAL BLANKET BOND |
| AGREEMENT J | – | DEPOSITORS FORGERY |
| **SECTION IV** | | |
| AGREEMENT K | – | LOSS OF RENTS |
| AGREEMENT L | – | GROSS EARNINGS |
| AGREEMENT M | – | EXTRA EXPENSE |

**LIMIT OF LIABILITY**

THE LIMIT OF LIABILITY UNDER THIS AGREEMENT SHALL BE ONLY THE EXCESS OF LOSS OVER;

$25,000 ULTIMATE NET LOSS EACH AND EVERY LOSS OR OCCURRENCE AS PER LIMIT OF LIABILITY PROVIDED AND,

$190,000 ANNUAL AGGREGATE ULTIMATE NET LOSS, HOWEVER AS RESPECTS TO THE ACCUMULATION OF ANNUAL AGGREGATE LOSSES THE ANNUAL AGGREGATE SHALL NOT BE CHARGED WITH ANY PROPERTY, AUTOMOBILE PHYSICAL DAMAGE, MOBILE EQUIPMENT OR CRIME LOSS UNDER $250 FOR ANY LOSS TO PROPERTY, AUTOMOBILE OR MOBILE EQUIPMENT, PHYSICAL DAMAGE OR CRIME COVERAGES.  WHEN $190,000 OF ANNUAL AGGREGATE LOSSES HAVE BEEN ACCUMULATED, A DEDUCTIBLE OF $250 SHALL APPLY TO ALL SUBSEQUENT LOSSES FOR PROPERTY, AUTOMOBILE OR MOBILE EQUIPMENT, PHYSICAL DAMAGE AND CRIME COVERAGES ONLY.

G/P0001(4/83)

PAGE 1 OF 26

IT IS FURTHER AGREED THAT THE LIMIT OF LIABILITY UNDER THIS AGREEMENT SHALL BE AS FOLLOWS:

UNDER SECTION I

### AGREEMENT A

| | |
|---|---|
| $6,000,000 | EACH BUILDING & CONTENTS SUBJECT TO THE VALUATION CLAUSE EXCEPT FOR PERILS OF FLOOD AND EARTHQUAKE. |
| $1,000,000 | IN AGGREGATE ANNUALLY FOR FLOOD. |
| $1,000,000 | IN AGGREGATE ANNUALLY FOR EARTHQUAKE. |
| $4,251,924 | CONTRACTORS' EQUIPMENT |

### AGREEMENT B

ACTUAL CASH VALUE OF THE VEHICLE FOR EACH AND EVERY LOSS.

UNDER SECTION II

### AGREEMENT C

$1,000,000     ANY ONE OCCURRENCE:  GENERAL LIABILITY

### AGREEMENT D

$1,000,000     ANY ONE OCCURRENCE:  LIQUOR LIABILITY

### AGREEMENT E

$1,000,000     ANY ONE OCCURRENCE:  AUTOMOBILE LIABILITY

### AGREEMENT F

$1,000,000     ANY ONE OCCURRENCE:  EMPLOYEE BENEFITS LIABILITY

UNDER SECTION III

### AGREEMENT G

$50,000     EACH AND EVERY LOSS:  MONEY & SECURITIES - INSIDE

### AGREEMENT H

$50,000     EACH AND EVERY LOSS:  MONEY & SECURITIES - OUTSIDE

### AGREEMENT I

$50,000     EACH AND EVERY LOSS:  COMMERCIAL BLANKET BOND

### AGREEMENT J

$50,000     EACH AND EVERY LOSS:  DEPOSITORS FORGERY

**UNDER SECTION IV**

**AGREEMENT K**

$50,000          PER BUILDING:  LOSS OF RENTS

**AGREEMENT L**

$2,185,700     PER BUILDING:  GROSS EARNINGS

**AGREEMENT M**

$75,000          PER BUILDING:  EXTRA EXPENSE

G/P0001(4/83)

## SECTION I - PROPERTY INSURANCE

## INSURING AGREEMENTS

**AGREEMENT A - BUILDING AND CONTENTS:**    The Company agrees, subject to the limitations, terms and conditions of this Insurance, to indemnify the Insured for all risks of physical loss or damage to All Real or Personal Property of every kind and description wherever located occurring during the period of this Insurance.

**AGREEMENT B - AUTOMOBILE:**  The Company agrees, subject to the limitations, terms, and conditions of this Insurance, to indemnify the Insured for loss or damage to Automobiles owned by the insured or on which the Insured has an obligation to provide adequate insurance, wherever located, against All Risks of Direct Physical Loss, including Collision of the Automobile with another object.

## SECTION I - DEFINITIONS

1.   **PROPERTY OF THE INSURED:**  The term, "Insured's Property" shall mean All Real and Personal Property, including leasehold improvements or betterments which the Insured owns, property which the Insured holds on consignments, or agrees to insure by any contractual agreement normal to its operations.

2.   **AUTOMOBILE:**  The term "Automobile" shall mean any motor vehicle, trailer or semi-trailer, including its equipment and any other equipment permanently attached thereto.  The word "Trailer" shall include semi-trailer.

3.   **ULTIMATE NET LOSS:**  The words "Ultimate Net Loss" in respect of this Section shall be understood to mean the loss sustained by the Insured after making deductions for all recoveries and salvages.

G/P0001(4/83)

**PAGE 4 OF 26**

## SECTION I – EXCLUSIONS

**WITH REGARD TO ALL PROPERTY, THIS INSURANCE DOES NOT INSURE AGAINST:**

1. Loss by moth, vermin, termites or other insects: wear, tear or gradual deterioration; rust, wet or dry rot or mold.

2. Loss or damage caused by

   (a) Radioactive or fissionable material
   (b) Contamination, other than by (a) above, unless directly resulting from Fire or Extended Coverage perils.

3. Loss resulting from loss of use (except such loss of use coverage as is afforded under a Standard Automobile Policy in respect of Agreement B above), delay or loss of markets.

4. Breakdown of machinery and/or boiler explosion, but not excluding loss resulting therefrom.

5. Loss resulting from dampness of atmosphere or variation in temperature unless caused by the perils of Fire and Extended Coverage.

6. Loss of electrical appliances or devices of any kind, including wiring, arising from electrical injury or disturbance to the said electrical appliances or devices or wiring from artificial causes unless fire or explosion ensues, and then only for direct loss or damage caused by such ensuing fire or explosion.

**WITH REGARD TO ALL REAL PROPERTY, THIS INSURANCE DOES NOT INSURE AGAINST:**

Loss by normal settling, normal shrinkage or normal expansion in foundations, walls, floors or ceilings.

**WITH REGARD TO PERSONAL PROPERTY, THIS INSURANCE DOES NOT INSURE AGAINST:**

1. Loss by mechanical derangement, inherent vice or latent defect.

2. Loss resulting from processing or faulty workmanship, unless fire and/or explosion ensues, and then only for direct loss or damage caused by such ensuing fire or explosion.

3. Loss resulting from shrinkage, evaporation, loss of weight or leakage, unless such loss is caused directly by fire or the combating thereof, lightning, windstorm, hail, explosion, strike, riot or civil commotion, aircraft, vehicles, breakage of pipes or apparatus, sprinkler leakage, vandalism and malicious mischief, theft or attempted theft.

4. Inventory shortage, mysterious disappearances, or loss resulting from any kind of infidelity or dishonesty on the part of the Insured or any of his employees, except from the perils covered in Section III (Money and Securities - Broad Form) of this Insurance.

**PAGE 5 OF 26**

G/P0001(4/83)

PROPERTY EXCLUDED FROM COVERAGE HEREUNDER:

Animals, aircraft, standing timber and growing crops and land.

## SECTION I - CONDITIONS

1. **VALUATION:** The Company shall not be liable for loss or damage in excess of:

    A.  In case of loss of or damage to REAL AND PERSONAL PROPERTY herein, the valuation shall be based on the values on file with the Company. However, this policy will provide an additional 25% coverage over and above such values declared because of inflation, additions, alterations or refurbishments during any one year of the policy term. However, the loss or damage shall not exceed the Limits of Liability described on Page 2 of this form. The basis of adjustment shall be as follows:

    1)  On buildings and structures and general contents for the cost, as of the date of loss, of replacement of the damaged or destroyed property in a new condition with materials of like size, kind and quality, all subject to the following conditions:

        a.  If property damaged or destroyed is useless to the insured or is not repaired, rebuilt or replaced on the same or another site within two years after the loss or damage, this company shall not be liable for more than the actual cash value (ascertained with proper deduction for depreciation) of the property destroyed.

        b.  The total liability of this company under this policy for loss to property included under this endorsement shall not exceed the smallest of the following:

            1.  The cost to repair, or

            2.  The cost to rebuild or replace, all as of the date of loss, on the same site, with new materials of like size, kind and quality, or

            3.  The actual expenditure incurred in rebuilding, repairing or replacing on the same or another site.

    2)  On stock in process at the value of raw material and labor expended plus the proper proportional of overhead charges.

    3)  On finished goods manufactured by the insured, at the regular cash selling prices at the location where the loss occurs, less all discounts and charges to which the property would have been subject had no loss occurred.

    4)  On property of others at the amount for which the insured is liable but in no event to exceed the replacement cost value.

    5)  On improvements and betterments, at replacement cost at the time and place of loss if actually replaced; if not so replaced, at actual cash value on date of loss.

PAGE 6 OF 26

G/P0001(4/83)

6)   On accounts, manuscripts, mechanical drawings and other records and documents not specifically excluded, at value blank plus cost of transcribing.

7)   On patterns and dies, at replacement cost if actually replaced, otherwise at actual cash value on date of loss.

8)   On machinery, equipment and any other insured property not otherwise provided for at replacement cost value at place of loss.

9)   On Fine Arts, at the appraised value of the article.

B.   Automobile or Mobile Equipment – the actual cash value of the automobile or mobile equipment at the time of loss.

2.   **DEBRIS REMOVAL:** This Insurance covers the expense of removal from the premises containing the property insured hereunder of debris remaining after any loss hereby insured against, except that there shall be no liability assumed for the expense of removal of any foundations.

3.   **REMOVAL CLAUSE:** This Insurance covers the expense and damage occasioned by removal from the premises endangered by the perils insured against wherever such property is located or removed for preservation.

4.   **APPRAISAL:** In the event the Insured and Company are unable to agree as to the amount necessary to rebuild, repair or replace the damaged or destroyed property or the actual amount of reimbursement to be paid, each party shall name a competent and disinterested appraiser and the two so chosen shall, before proceeding further, appoint a competent and disinterested umpire. The appraisers together shall obtain reconstruction estimates, and calculate the amounts of reimbursement due, and failing to agree, shall submit their differences to the umpire.

The award, in writing, duly verified by any two shall determine the points in question. Both parties shall pay the cost of their own appraisers and equally pro rate the cost of the umpire.

5.   **CIVIL AUTHORITY CLAUSE:** Notwithstanding anything contained in this Insurance, property which is insured under this Insurance is also covered against the risk of damage or destruction by civil authority during a conflagration and for the purpose of retarding the same; provided that neither such conflagration nor such damage or destruction is caused or contributed to by war, invasion, revolution, rebellion, insurrection or other hostilities or warlike operations.

6.   **ORDINANCE DEFICIENCY CLAUSE:** Notwithstanding anything contained herein to the contrary, the Company shall be liable also for the loss occasioned by the enforcement of any state or municipal law, ordinance or code, which necessitates, in repairing or rebuilding, replacement of material to meet such requirements. If demolition is required to comply with such enforcement, the Company shall also be liable for such additional costs.

7.   **EXPENSE TO REDUCE OR PREVENT LOSS:** This Insurance also covers such expenses as are necessarily incurred for the purpose of reducing or preventing any loss under this Insurance not exceeding, however, the amount by which the loss under this Insurance is thereby reduced.

G/P0001(4/83)

# SECTION II – CASUALTY INSURANCE

## INSURING AGREEMENTS

**AGREEMENT C – GENERAL LIABILITY:** The Company agrees, subject to limitations, terms and conditions hereunder mentioned in Section II, General Conditions or added hereto by Endorsement, to pay on behalf of the Insured all sums which the Insured shall be legally obligated to pay or assumed by the Named Insured under contract or agreement, for damages direct or consequential, and expenses, all as more fully defined by the term "Ultimate Net Loss", because of Personal Injuries, including death at any time resulting therefrom, suffered or alleged to have been suffered by any person or person's except to employees of the insured for any liability imposed under any Workers' Compensation, Employers Liability or similar statute; and/or Property Damage or the loss of use thereof; caused by an occurrence happening during the period of insurance, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such Personal Injury or Property Damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient.



**AGREEMENT D – LIQUOR LIABILITY:** In accordance with the provisions of the above Agreement C, the Company agrees that coverage for the Insured extends to liability for the sale or distribution of alcoholic beverages by reason of any local, state or Federal Liquor control laws now in force and all laws amendatory thereto; and that such extension includes indemnity for loss of means of support.

**AGREEMENT E – AUTOMOBILE LIABILITY:** The Company agrees, subject to limitations, terms and conditions hereunder mentioned in Section II, General Conditions or added hereto by Endorsement, to pay on behalf of the Insured all sums which the Insured shall be legally obligated to pay or assumed by the Named Insured under contract or agreement, for damages direct or consequential, and expenses, all as more fully defined by the term "Ultimate Net Loss", because of Personal Injuries, including death at any time resulting therefrom, suffered or alleged to have been suffered by any person or persons except to employees of the insured for any liability imposed under any Workers' Compensation, Employers Liability or similar statute; and/or Property Damage or the loss of use thereof; arising out of the ownership, maintenance or use of any automobile and occurring during the period of insurance, and shall include uninsured and underinsured motorists coverage, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such Personal Injury or Property Damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient.

## AGREEMENT F – EMPLOYEE BENEFIT LIABILITY

### THIS IS A CLAIMS MADE AGREEMENT

In consideration of the premium charged and subject to the terms, exclusions and definitions hereinafter mentioned the Company agree to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as a result of damages sustained by an employee, prospective employee, former employee or the beneficiaries or legal representatives thereof in the administration of the Insured's Employee Benefit Programs as defined herein and caused by any negligent act, error or omissions of the Insured or any other person for whose acts the Insured is legally liable, occurring during the policy period and then only if claim is made or suit is brought during the policy period or within one year after the end of the policy period.

**PAGE 8 OF 26**

G/P0001(4/83)

**EXCLUSIONS:**

This insurance does not apply:

(a)   to any dishonest, fraudulent, criminal or malicious act, libel, slander, discrimination or humiliation;

(b)   to bodily injury to, or sickness, disease, or death, of any person, or to injury to or destruction of any tangible property, including the loss of use thereof;

(c)   to any claim for failure of performance of contract by any insurer, including failure of any Employee Benefit Program;

(d)   to any claim based upon the Insured's failure to comply with any law concerning Workers' Compensation, Unemployment Insurance, Social Security or Disability Benefits;

(e)   to any claim based upon:

   (1)   failure of stock to perform as represented by an Insured;

   (2)   advice given by an Insured to an employee to participate or not to participate in stock subscription plans;

   (3)   the investment or non-investment of funds;

(f)   to claims based upon the Employee Retirement Income Security Act of 1974, Public Law 93-406 commonly referred to as the Pension Reform Act of 1974 and amendments thereto, or similar provisions of any Federal, State or Local Statutory Law or Common Law.

**DEFINITIONS:**

(a)   "Employee Benefits Program" - The term "Employee Benefit Programs" shall mean group life insurance, group health insurance, profit sharing plans, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social security, disability benefits insurance and travel, savings or vacation plans.

(b)   "Administration" - The unqualified word "Administration" wherever used, shall mean:

   (1)   giving counsel to employees with respect to the Employee Benefit Programs;

   (2)   interpreting the Employee Benefit Programs;

   (3)   handling of records in connection with the Employee Benefit Programs;

   (4)   effecting enrollment, termination or cancellation of employees under the Employee Benefit Programs;

   provided all such acts are authorized by the Named Insured.

## SECTION II - DEFINITIONS

1.   PERSONAL INJURIES - The term "personal injuries" wherever used herein, shall mean:

   (a)   Bodily Injury, Mental Injury, Mental Anguish, Shock, Sickness, Disease, Disability, False Arrest, False Imprisonment, Wrongful Eviction, Detention, Malicious

G/P0001(4/83)

PAGE 9 OF 26

Prosecution, Discrimination, Humiliation, Invasion of Right of Privacy, Libel, Slander or Defamation of Character; also Piracy and any Infringement of Copyright or of Property, Erroneous Service of Civil Papers, Violation of Civil Rights, Assault and Battery, and Disparagement of Property.

(b)    The definition of bodily injury is amended to include Incidental Medical Malpractice Injury.

Incidental Medical Malpractice Injury means injury arising out of the rendering of or failure to render, during the policy period, the following services:

1.    medical, surgical, dental, x-ray, or nursing service or treatment or the furnishing of food or beverages in connection therewith; or

2.    the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

This coverage does not apply to:

1.    expenses incurred by the insured for first-aid to others at the time of an accident;

2.    any insured engaged in the business or occupation of providing any of the services described under B(1) and (2) above;

3.    injury caused by any indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under B (1) and (2) above.

2.    **PROPERTY DAMAGE** - The term "property damage" wherever used herein shall mean damage to or destruction or loss of property, excluding, however, damage to property owned by the Named Insured, but including damage to property of others in the care, custody or control of the Named Insured or property which is purchased by the Named Insured under a contract which provides that the title remain with the sellers until payments have been completed, the liability of the Company being limited to the amount of payments outstanding.

3.    **OCCURRENCE** - The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period.    All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence.

4.    **ULTIMATE NET LOSS** - The term "ultimate net loss" shall mean the total sum which the Insured becomes obligated to pay by reason of personal injury or property damage claims, either through adjudication or compromise, after making proper deductions for all recoveries and salvages, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Named Insured's permanent employees, and fees, charges and expenses incurred by Gallagher Bassett Insurance Service for services performed within their contract with the Insured.

G/P0001(4/83)

PAGE 10 OF 26

## SECTION II – EXCLUSIONS

THIS INSURANCE DOES NOT APPLY –

(a)   except with respect to operations performed by independent contractors, to the ownership, maintenance or use, including loading or unloading of aircraft; and watercraft over 25 feet in length;

(b)   to damage or destruction of property owned by the Insured.

(c)   Medical Malpractice except as defined under Section #1B.

## SECTION II – CONDITIONS

1.   **CROSS LIABILITY:** In the event of claims being made by reason of personal injuries and/or property damage suffered by any employee of one Insured herein for which another Insured herein is or may be liable, then this Insurance shall cover such Insured against whom a claim is made or may be made in the same manner as if separate policies had been issued to each Insured herein. Nothing contained herein shall operate to increase the Company's Limit of Liability as set forth herein. The Company agrees to waive all rights of subrogation against all or any of the corporations or individuals comprising the Insured.

2.   **NOTICE OF OCCURRENCE:** Whenever the Insured has information from which the Insured may reasonably conclude that an occurrence covered under Section II of this Insurance involves injuries or damages, notice shall be given to Gallagher Bassett Insurance Service, Gould Center, Golf Road, Rolling Meadows, Illinois 60008 as soon as practicable. Claims shall not be prejudiced if the Insured, through clerical oversight or error, fails to notify the above firm of any such occurrence.

## SECTION III – CRIME INSURANCE

### INSURING AGREEMENTS

## AGREEMENT G – MONEY AND SECURITIES (COVERAGE WITHIN PREMISES):

The Company agrees, subject to the limitations, terms and conditions of this Insurance, to indemnify the Insured for all loss caused by reason of theft, burglary, robbery, kidnapping, disappearance or destruction of any money or securities which may at any time be, or believed by the Insured to be, in or upon any premises, occupied or used by the Insured or by any bank, trust company or safe deposit company. Such Insurance as is afforded by this Insurance also applies to deposits within a night depository safe provided by a bank or trust company on its premises for the use of its customers.

## AGREEMENT H – MONEY AND SECURITIES (COVERAGE OUTSIDE PREMISES):

The Company agrees, subject to the limitations, terms and conditions of this Insurance, to indemnify the Insured for all loss caused by reason of theft, robbery, kidnapping, disappearance or destruction of any money or securities (other than by fraud or connivance of the Insured's officers or employees) while in transit in the custody of the Insured's officers or employees anywhere, the liability of the Company to commence at the moment when the person into whose hands the property may be delivered on behalf of the Insured receives the same and to continue until the delivery thereof at final destination.

G/P0001(4/83)

## AGREEMENT I - COMMERCIAL BLANKET BOND:

The Company (hereinafter called "the Surety") agrees, subject to the terms and conditions set forth herein, to indemnify the Employer against any loss of Money or other property real or personal (including that part of any inventory shortage which the Employer shall conclusively prove is caused by the dishonesty of any Employee or Employees: belonging to the Employer or in which the Employer has a pecuniary interest or for which the employer is legally liable by the employer in any capacity, whether the Employer is legally liable therefore or not, which the Employer shall during the term of this Insurance sustain or discover that they have sustained through larceny, theft, embezzlement, forgery, misappro-priation, wrongful abstraction, wilful misapplication or other fraudulent or dishonest act or acts committed by any one or more of the Employees as defined, acting directly or in collusion with others.

## AGREEMENT J - DEPOSITORS FORGERY

Loss which the Insured or any bank which is included in the Insured's proof of loss and in which the Insured carries a checking or savings account, as their respective interests may appear, shall sustain through forgery or alteration of, on or in any check, draft, promissory note, bill of exchange, or similar written promise, order or direction to pay a sum certain in money, made or drawn by or drawn upon the Insured, or made or drawn by one acting as agent of the Insured, or purporting to have been made or drawn as hereinbefore set forth, including

   a.  any check or draft made or drawn in the name of the Insured, payable to a fictitious payee and endorsed in the name of such fictitious payee;

   b.  any check or draft procured in a face to face transaction with the Insured, or with one acting as agent of the Insured, by anyone impersonating another and made or drawn payable to the one so impersonated and endorsed by anyone other than the one so impersonated; and

   c.  any payroll check, payroll draft or payroll order made or drawn by the Insured, payable to bearer as well as to a named payee and endorsed by anyone other than the named payee without authority from such payee;

whether or not any endorsement mentioned in a., b., or c. be a forgery within the law of the place controlling the construction thereof.

Mechanically reproduced facsimile signatures are treated the same as handwritten signa-tures.

The Insured shall be entitled to priority of payment over loss sustained by any bank aforesaid. Loss under this Insuring Agreement, whether sustained by the Insured or such bank, shall be paid directly to the Insured in its own name, except in cases where such bank shall have already fully reimbursed the Insured for such loss. The liability of the Company to such bank for such loss shall be a part of and not in addition to the amount of insurance applicable to the Insured's office to which such loss would have been allocated had such loss been sustained by the Insured.

If the Insured or such bank shall refuse to pay any of the foregoing instruments made or drawn as hereinbefore set forth, alleging that such instruments are forged or altered, and such refusal shall result in suit being brought against the Insured or such bank to enforce such payment and the Company shall give its written consent to the defense of such suit, then any reasonable attorney's fees, court costs, or similar legal expenses incurred and paid by the Insured or such bank in such defense shall be construed to be a loss under this Insuring Agreement and the liability of the Company for such loss shall be in addition to any other liability under this Insuring Agreement.

PAGE 12 OF 26

G/P0001(4/83)

## SECTION III - DEFINITIONS

### INSURING AGREEMENTS G AND H:

1. **MONEY:** The term "Money" as used in this Insurance shall be deemed to mean currency, coin, bank notes, uncancelled and precancelled postage and unused postage in postage meters.

2. **SECURITIES:** The term "Securities" shall be deemed to mean Federal Food Stamps, express, postal and bank money orders, postal notes, debentures, scrip, checks, warrants, transfers, coupons, demand and time drafts, bills of exchange, acceptances, promissory notes, certificates of deposits, certificates of stock, bonds, car trust certificates, interim receipts and certificates, warehouse receipts, bills of lading and all other instruments of a similar nature including mortgages upon real estate or upon chattels and upon interests herein, and instruments in the nature of mortgages upon real estate or upon chattels and upon interests therein, and assignments of such mortgages and instruments.

3. **EMPLOYEES:** The term "Employees" shall mean not only persons compensated by the Insured but also those directed by the Insured and including those independent contractors and/or services which may be considered as usually performed by employees of the Insured.

4. **THEFT:** The term "Theft" shall include "trick and device".

5. **ULTIMATE NET LOSS:** The words "ultimate net loss" in respect of this Section shall be understood to mean the actual loss sustained by the Insured after making deductions for all recoveries and salvages.

### INSURING AGREEMENT I

1. **EMPLOYER:** The term "Employer" as used in this Bond shall mean the Insured named in the Declarations and as further defined in General Conditions, item 22.

2. **EMPLOYEE OR EMPLOYEES:** The terms "Employee" or "Employees" as used in this Bond shall be deemed to mean respectively one or more of the natural persons who on the effective date of this Bond or at any other time during the term of this Bond are in the regular service of the Employer in the ordinary course of the Employer's business and who are compensated by salary, wages and/or commission, and whom the Employer has the right to govern and direct at all times in the performance of such service, but not to mean brokers, factors, commission merchants, consignees, contractors or other agents or representatives of the same general character.

## SECTION III - EXCLUSIONS

### THIS INSURANCE DOES NOT APPLY UNDER INSURING AGREEMENTS G AND H

(a) to any fraudulent, dishonest or criminal act other than robbery or safe burglary or attempt thereat, committed by the Insured or by any officer, employee (except Brinks or Armored Car Employees): trustee or authorized representative of the Insured, whether acting alone or in collusion with others.

(b) to forgery by whomsoever committed.

G/P0001(4/83)

## SECTION III - CONDITIONS

1. **UNDER INSURING AGREEMENTS G, H AND I**

Warranted free of all claims for losses not discovered within the term of this Insurance and for losses sustained and/or acts committed prior to                    (hereinafter called the Retroactive Date) but with the understanding that in the event of (a) the expiration of this Insurance by reason of non-renewal, or (b) the termination of this Insurance as an entirety, as provided in General Condition 5, the Insured shall have twelve calendar months following the date of such expiration or termination in which to discover losses sustained between the Retroactive Date and the date of such expiration or termination.

2. It is understood and agreed that this Insurance covers money and securities of the Insured or as respects which the Insured is legally liable or held by it in any capacity, whether or not the Insured is liable for the loss thereof. If legal proceedings are taken against the Insured to enforce a claim for money and securities so held, the Insured shall immediately notify the Company in writing.

Notwithstanding anything to the contrary contained herein it is understood and agreed that in the event of this Insurance being immediately succeeded by a similar Insurance with the Company on which the Retroactive Date is                    the said succeeding insurance shall be deemed to be a renewal hereof and in consequence the discovery period provided herein shall not be operative.

3. **UNDER INSURING AGREEMENT I**

(a) Upon the discovery of any loss hereunder this Bond shall be treated as reinstated so as at all times to continue in force for the sum set forth herein notwithstanding any previous loss for which the Surety may have paid or be liable to pay hereunder provided however that in no event shall the Surety be liable under this Bond for an amount greater than the limits of liability stated on account of any one loss or series of losses caused by the fraudulent or dishonest acts of any Employee or in which such Employee is concerned or implicated.

(b) In case any reimbursement to be obtained or recovery be made by the Employer or by the Surety on account of any loss covered under this Bond, the net amount of such reimbursement or recovery, after deducting the actual cost of obtaining or making the same, shall be applied to reimburse the Employer in full for that part if any, of such loss in excess of this Bond, and the balance, if any, or the entire net reimbursement or recovery if there be no such excess loss, shall be applied to that part of such loss covered by this Bond or, if payment shall have been made by the Surety, to its reimbursement therefor. The Employer shall execute all necessary papers and render all assistance not pecuniary to secure unto the Surety the rights provided for in this paragraph. The following shall not be reimbursement or recovery within the meaning of this paragraph: suretyship, insurance or reinsurance; also security or indemnity taken from any source by or for the benefit of the Surety.

(c) This Bond shall be deemed cancelled as to any Employee immediately upon discovery by the Employer, of any fraudulent or dishonest act on the part of such Employee; or at 12:01 A.M. Standard Time as aforesaid upon the effective date specified in a written notice served upon the Employer or sent by registered mail. Such date if the notice be served shall be not less than fifteen days after such service, or if sent by registered mail, not less than twenty days after the date borne by the sender's registry receipt.

G/P0001(4/83)

PAGE 14 OF 26

## SECTION IV

### AGREEMENT K – LOSS OF RENTS

1.  In consideration of the premium paid and subject to the terms, conditions and extensions of the policy to which this extension is attached, this policy covers Rental Value. This company shall be liable for the ACTUAL LOSS SUSTAINED by the insured resulting directly from necessary untenantability, caused by damage to or destruction of the building(s) or structure(s) as furnished and equipped by the insured, on the described premises by the peril(s) insured against during the term of this policy for twelve months, but not exceeding the reduction in Rental Value less charges and expenses which do not necessarily continue during the period of untenantability, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed commencing with the date of such damage or destruction and not limited by the date of expiration of this policy.

2.  **RENTAL VALUE:** For the purposes of this insurance "Rental Value" is defined as the sum of:

    A.  The total anticipated gross rental income from tenant occupancy of the described property as furnished and equipped by the insured, and

    B.  The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the insured, and

    C.  The fair rental value of any portion of said property which is occupied by the insured.

    In determining Rental Value due consideration shall be given to the rental experience before the date of damage or destruction and the probable experience thereafter had no loss occurred.

### EXTENSIONS OF COVERAGE

1.  **ALTERATIONS AND NEW BUILDINGS:** Permission granted to make alterations in or to construct additions to any building described and to construct new buildings on the described premises. This policy is extended to cover, subject to all its provisions and stipulations, loss of Rental Value resulting from damage to or destruction of such alterations, additions or new buildings while in course of construction and when completed or occupied, provided that, in the event of damage to or destruction of such property (including building materials, supplies, machinery or equipment incident to such construction or occupancy while on the described premises or within 100 feet thereof) so as to delay restoration to a tenantable condition, the length of time for which this company shall be liable shall be determined as otherwise provided herein but such determined length of time shall be applied and the loss hereunder calculated from the date that the property would have been tenantable had no damage or destruction occurred.

2.  **EXPENSES TO REDUCE LOSS:** This policy also covers such expenses as are necessarily incurred for the purpose of reducing loss under this policy, but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this policy is thereby reduced. Such expenses shall not be subject to the application of the Coinsurance Clause.

3. **INTERRUPTION BY CIVIL AUTHORITY:** This policy is extended to include the actual loss sustained by the insured, resulting directly from untenantability as covered hereunder, during the length of time, not exceeding 2 consecutive weeks, when, as a direct result of damage to or destruction of property adjacent to the premises herein described to or destruction of property adjacent to the premises herein described by the peril(s) insured against, access to such described premises is specifically prohibited by order of civil authority.

All other terms and conditions remain unchanged.

## AGREEMENT L – GROSS EARNINGS:

### INSURING CLAUSE

1. In consideration of the premium paid and subject to the terms, conditions and extensions of the policy to which this extension is attached. This policy covers against loss resulting directly from necessary interruptions of business caused by damage to or destruction of the "Property Insured" by the "Perils Insured" during the term of this policy.

2. In the event of such damage or destruction, the company shall be liable for the ACTUAL LOSS SUSTAINED by the named insured resulting directly from such interruption of business for twelve months, but not exceeding the reduction in gross earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such part of the property as has been damaged or destroyed, commencing with the date of damage or destruction and not limited by the date of expiration of the policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the named insured with the same quality of service which existed immediately preceding the loss.

Ordinary payroll expense shall mean the payroll expense for all employees of the named insured affected by the loss or damage, except officers, executives, department managers, employees under contract, and other important employees.

### DEFINITIONS

1. **GROSS EARNINGS:**

In respect to Non-Manufacturing or Mercantile Risks, "Gross Earnings" are defined as the sum of:

a) Total net sales, and

b) Other earnings derived from the operations of the business less the cost of

c) Merchandise sold, including packaging materials, therefore,

d) Materials and supplies consumed directly in supplying the service(s) sold by the insured, and

e) Service(s) purchased from outside (not employees of the insured) for resale which do not continue under contract.

G/P0001(4/83)                                            PAGE 16 OF 26

In respect to **Manufacturing Risks** "Gross Earnings" are defined as the sum of:

a)   The total net sales value of production.

b)   Total net sales of merchandise, and

c)   Other earnings derived from operations of the business, less the cost of

d)   Raw stock from which such production is derived.

e)   Supplies consisting of materials consumed directly in the conversion of such raw stock into finished stock, or in supplying the services sold by the insured.

f)   Merchandise sold, including packaging materials, therefore, and

g)   Service(s) purchased from outsiders (not employees of the insured) for resale which do not continue under contract.

No other costs shall be deducted in determining Gross Earnings.

In determining Gross Earnings, due consideration shall be given to the experience of the business before the date of loss or damage and the probable experience thereafter had no loss occurred.

2.   **RAW STOCK:**

Is material in the state in which the insured received it for conversion into finished stock.

3.   **STOCK IN PROCESS:**

Is raw stock which has undergone any aging, seasoning, mechanical or other process of manufacture at the insured's premises but which has not become finished stock.

4.   **FINISHED STOCK:**

Is stock manufactured by the insured which in the ordinary course of the insured's business ready for packing, shipment, or sale.

5.   **MERCHANDISE:**

Is goods kept for sale by the insured which are not the product of manufacturing operations conducted by the insured.

6.   **NORMAL:**

Is the condition that would have existed had no loss occurred.

## CONDITIONS

1.   **DIRECT DAMAGE:**

No claims shall be sustained against this Extension resulting from the necessary interruption of business unless and until a loss has been paid, or liability admitted, in respect to direct physical damage to property insured under the policy to which this Extension is attached, giving rise to business interruption.

G/P0001(4/83)

PAGE 17 OF 26

This condition shall not apply if no such payment shall have been made nor liability admitted solely owing to the operation of a deductible in such policy excluding liability for losses below a specified amount.

2. **RESUMPTION OF OPERATIONS:**

If the insured could reduce the loss resulting from the interruption of business:

a) By complete or partial resumption of operation of the property, whether or not such property be lost or damaged, or

b) By making use of merchandise or other property at the insured's locations or elsewhere, and,

c) In respect to Manufacturing Risks, by making use of stock (raw - in process or finished) at the insured's locations or elsewhere, such reduction shall be taken into account in arriving at the amount of loss hereunder.

3. **EXPENSES TO REDUCE LOSS:**

This Extension also covers such expenses as are necessarily incurred for the purpose of reducing loss under this Extension (except expenses incurred to extinguish a fire), and in respect to Manufacturing Risks, such expense, in excess of normal, as would necessarily be incurred in replacing any finished stock used by the insured to reduce loss under this Extension; but in no event to exceed the amount by which loss under this Extension is thereby reduced. Such expenses shall not be subject to the application of any contribution clause.

4. **FINISHED STOCK:**

In respect to Manufacturing Risks, the company shall not be liable for any loss resulting from loss of or damage stock nor for the time required to reproduce such finished stock.

5. **SPECIAL EXCLUSIONS:**

The company shall not be liable for any increase of loss which may be occasioned by any local or state ordinance or law regulating construction or repair of buildings or structures, nor by the suspension, lapse or cancellation of any lease or license, contract or order, nor for any increase of loss due to interference at the described premises by strikers or other persons with rebuilding or replacing the property or with the resumption or continuance of the business; nor shall the company be liable for any other consequential or remote loss.

6. **SPECIAL CONDITIONS APPLICABLE TO MINING RISKS:**

The following additional conditions (a) and (b) are applicable only to Mining Risks:

a) This Extension does not extend to cover any loss caused by the peril(s) insured against occurring in mine or mines or by the disturbance of any property underground, unless as a result of such peril(s) any superstructure above ground is damaged or destroyed and then only for the loss that would be occasioned during the time required to repair or replace such structure or structures.

b) This Extension applies only to the building and machinery that contribute to the production of the mining plant. Commissaries, commissary warehouses and dwellings, including contents of such buildings, are excluded unless specifically provided for herein.

**PAGE 18 OF 26**

G/P0001(4/83)



All other terms and conditions remain unchanged.

## AGREEMENT M – EXTRA EXPENSE

1. **Insuring Clause**

    A.  In consideration of the premium paid and subject to the terms, conditions, and exclusions of the policy to which this Extension is attached, this policy covers the necessary Extra Expense, as hereinafter defined, incurred by the insured in order to continue as nearly as practicable the normal operation of the insured's business following damage to or destruction of real or personal property, by the peril(s) insured against during the term of this policy, which property is on premises occupied by the insured and situated as herein described.

    B.  In the event of such damage or destruction, this company shall be liable for such necessary Extra Expense incurred for twelve months hereinafter referred to as the "period of restoration," as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of damage or destruction and not limited by the date of expiration of this policy.

2. **Resumption of Operations**

    It is a condition of this insurance that as soon as practicable, the insured shall resume normal operation of the business and shall dispense with such Extra Expense.

3. **Extra Expense**

    The term "Extra Expense," wherever used in this form, is defined as the excess (if any) of the total cost incurred during the period of restoration chargeable to the operation of the insured's business, over and above the total cost that would normally have been incurred to conduct the business during the same period had no damage or destruction occurred. Any salvage value of property obtained for temporary use during the period of restoration, which remains after the resumption of normal operations, shall be taken into consideration in the adjustment of any loss hereunder.

4. **Definitions**

    The following terms wherever used in this contract shall mean:

    A.  "Month" – thirty consecutive days.

    B.  "Normal" – the condition that would have existed had no loss occurred.

5. **Extensions of Coverage**

    A.  Alterations and New Buildings

    Permission granted to make alterations in or to construct additions to any building described and to construct new buildings on the described premises. This policy is extended to cover, subject to all its provisions and stipulations, Extra Expense resulting from damage to or destruction of such alterations, additions or new buildings while in course of construction and when completed or occupied, provided that, in the event of damage to or destruction of such property (including building materials, supplies, machinery or equipment incident

G/P0001(4/83)

**PAGE 19 OF 26**



to such construction or occupancy while on the described premises or within 100 feet thereof) so as to delay commencement of business operations of the insured, the length of time for which this Company shall be liable shall be determined as otherwise provided herein but such determined length of time shall be applied and the loss hereunder calculated from the date that business operations would have begun had no damage or destruction occurred.

B.    Interruption By Civil Authority

This policy is extended to include necessary Extra Expense incurred by the insured as covered hereunder during the length of time, not exceeding 2 consecutive weeks, when, as a direct result of damage to or destruction of property adjacent to the premises herein described by the peril(s) insured against, access to such described premises to specifically prohibited by order of civil authority.

All other terms and conditions remain unchanged.

G/P0001(4/83)

## GENERAL CONDITIONS

**1.  PREMIUM PROVISION:**

See Endorsement #A Attached

**2.  SALVAGE AND RECOVERY CLAUSE:**

All salvages, recoveries and payments recovered or received subsequent to a loss settlement under this Insurance shall be applied as if recovered or received prior to the said settlement and all necessary adjustments shall be made by the parties hereto.

**3.  INSPECTIONS, AUDIT AND VERIFICATION OF VALUES:**

The Company or their duly authorized representatives shall be permitted, at all reasonable times during continuance of this Insurance, to inspect the premises used by the Insured and to examine the Insured's books or records so far as they relate to coverage afforded by this Insurance.

**4.  RECORDS:**

It is hereby understood and agreed that the records and books as kept by the Insured shall be acceptable to the Company in determining the amount of loss or damage covered hereunder.

**5.  CANCELLATION:**

This Insurance may be cancelled as of any anniversary date by either of the parties upon written notice to the other party stating when, not less than thirty (30) days thereafter cancellation shall be effected.

If this Insurance shall be cancelled by the Insured the Company shall retain the customary short rate proportion of the premium hereon, except that if this Insurance is on an adjustable basis, the Company shall receive the earned premium hereon or the customary short rate proportion of any minimum premium stipulated herein which ever is the greater.

If this insurance shall be cancelled by or on behalf of the Company, the Company shall retain the pro rata proportion of the premium hereon, except that if this Insurance is on an adjustable basis the Company shall receive the earned premium hereon or the pro rata proportion of any minimum premium stipulated herein whichever is the greater.

Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of Cancellation but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

If this insurance shall be cancelled by the Insured, the annual aggregated retention shall be adjusted in accordance with customary short rate cancellation factors for the period this insurance was in effect.

G/P0001(4/83)

**6.   BANKRUPTCY AND INSOLVENCY:**

In the event of the bankruptcy or insolvency of the Insured or any entity comprising the Insured, the Company shall not be relieved of the payment of any claims hereunder because of such bankruptcy or insolvency.

**7.   OTHER INSURANCE:**

If the Insured has other Insurance against loss covered by this Insurance the Company shall be liable, under the terms of this Insurance, only as excess of coverage provided by such other Insurance, and no monies payable or collectible from such other Insurance shall accrue in the aggregate loss fund of this Insurance.

**8.   MORTGAGE CLAUSE:**

The interest of any mortgagor on property covered hereunder is included as if a separate endorsement were attached hereto to the extent of the amount of mortgage as of the date of loss subject to the limits of liability set forth in this Insurance.

**9.   CLAIMS:**

The Insured shall immediately notify the Company through Gallagher Bassett Insurance Services, _____ by certified or registered mail, of any occurrence the cost of which is likely to result in payment by the Company under this Insurance. The Company shall have the opportunity to be associated with the Insured in defense of any claims, suits, or proceedings relative to an occurrence wherein the opinion of the Company, their liability under this Insurance is likely to be involved, in which case the Insured and Company shall cooperate to the mutual advantage of both.

**10.   LOSS PAYMENTS:**

When it has been determined that the Company is liable under this Insurance, the Company shall thereafter promptly reimburse the Insured for all payments made in excess of the amounts stated in Subparagraphs A and B of the Limits Agreement. All adjusted claims shall be paid or made good to the Insured within thirty days after their presentation to Gallagher Bassett Insurance Services, and acceptance by the Company of satisfactory proof of interest and loss.

**11.   APPEAL:**

In the event the Insured and the Company are unable to agree to the advisability of appealing a judgment, a disinterested attorney, mutually agreeable to the Company and the Insured, shall be retained and directed to render a written opinion as to his recommendation concerning such appeal. Such written recommendation shall be binding on both the Insured and the Company. Fees of such retained attorney shall be borne equally by both parties for the services of rendering his recommendation only. The Insured's portion of such fee shall not accrue in the aggregate loss fund.

**12.   LITIGATION PROCEEDINGS:**

No suit to recover on account of loss under this Insurance shall be brought until ninety days after the proof of loss shall have been furnished, nor at all unless commenced within twenty seven months shall begin upon notice to the Insured of such loss or claim.

G/P0001(4/83)                                         **PAGE 22 OF 26**

13.    **SUBROGATION:**

The Company shall be subrogated to all rights which the Insured may have against any person or other entity in respect to any claim or payment made under this Insurance, and the Insured shall execute all papers required by the Company and shall cooperate with the Company to Secure the Company's rights.   In case any reimbursement obtained or recovery made by the Insured or the Company on account of any loss covered by this Insurance, the net amount of such reimbursement or recovery, after deducting the actual cost of obtaining or making the same, shall be first applied in the following order:

    (a)   Amount of loss which exceeds the applicable limit of liability.

    (b)   To reduce the Company's loss until the Company is fully reimbursed.

    (c)   To reduce the Insured's loss because of the application of the aggregate loss fund.

14.    **WAIVER OF SUBROGATION:**

This Insurance shall not be invalidated if the Insured by written agreement has waived or shall waive its right of recovery from any party for loss or damage covered hereunder; provided, that any such waiver is made prior to the occurrence of said loss or damage.

15.    **CONFLICTING STATUTES:**

In the event that any provision of this Insurance is unenforceable by the Insured under the laws of any State or other jurisdiction wherein it is claimed that the Insured is liable for any injury covered hereby because of non-compliance with any statute thereof, then this policy shall be enforceable for the Insured with the same effect as if it complied with such statutes.

16.    **ASSIGNMENT:**

Assignment of Interest, under this Insurance shall not bind the Company until the Company's consent is endorsed hereon.

17.    **CHANGES:**

By Acceptance of this Insurance the Insured agrees that it embodies all agreements existing between the Insured and the Company or any of its agents relating to this Insurance.  None of the provisions, conditions or other terms of this Insurance shall be waived or altered except by endorsement; nor shall notice to any agent or knowledge possessed by any agent or by any other person be held to effect a waiver or change in any part of this Insurance.

18.    **WAR CLAUSE:**

Coverage does not apply under this Insurance for loss or damage directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, any weapon of war employing atomic fission or radioactive force whether in-time of peace or war, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority unless such acts of destruction by order of civil authority is at the time of and for the purpose of preventing spread of fire; or

claims or liability arising directly or indirectly from nuclear fission, nuclear fusion or radioactive contamination.

19. **FRAUDULENT CLAIMS:**

If the insured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this insurance shall become void and all claim hereunder shall be forfeited.

20. **RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE – PHYSICAL DAMAGE – DIRECT:**

This policy does not cover any loss or damage arising directly or indirectly from nuclear reaction, nuclear radiation or radioactive contamination however such nuclear reaction, nuclear radiation or radioactive contamination may have been caused. Nevertheless, if Fire is an insured peril and a Fire arises directly or indirectly from nuclear reaction, nuclear radiation or radioactive contamination any loss or damage arising directly from that Fire shall (subject to the provisions of this policy) be covered Excluding however all loss or damage caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that Fire.

\*NOTE – If Fire is not an insured peril under this policy the words from "Nevertheless" to the end of the clause do not apply and should be disregarded.

21. **NUCLEAR INCIDENT EXCLUSION CLAUSE – LIABILITY – DIRECT (BROAD):**

    I.    Under any Liability Coverage, to injury, sickness, disease, death or destruction

        (a)    with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability, or

        (b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    II.    Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

    III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

        (a)    the nuclear material (1) is at any nuclear facility owned by or operated by or on behalf of, an Insured or (2) has been discharged or dispersed therefrom;

        (b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

G/P0001(4/83)

**PAGE 24 OF 26**

08CV2676   EDA
JUDGE HOLDERMAN
MAGISTRATE JUDGE BROWN

EXHIBIT 1

(c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.  As used in this endorsement:

"hazardous Properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material, "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel components, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material, (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a)  any nuclear reactor,
(b)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,
(c)  any equipment or device used for the processing, fabricating or allowing of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grains of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,
(d)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operation conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the policy to which it is attached.

22.  **NAME OF INSURED**

It is also agreed that the unqualified word Insured wherever used in this insurance includes not only the Named Insured but also

1.  any official, trustee, director, officer, or employee of the Named Insured while acting within the scope of his duties as such, and any person, organization, trustee or estate to whom the Named Insured is obligated by virtue of written contract or agreement to provide insurance such as is offered by this insurance, but only in respect to operations by or on behalf of the Named Insured.

G/P0001(4/83)                                            **PAGE 25 OF 26**

2. under Section II Agreement E any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the Named Insured or with his permission, and any official of the Named Insured with respect to the use of non-owned automobile in the business of the Named Insured. This insurance with respect to any person or organization other than the Named Insured does not apply:

(a) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place, with respect to any accident arising out of the operation thereof;

(b) to any employee with respect to injury to or sickness, disease or death of another employee of the same employer injured in the course of such employment in an accident arising out of the maintenance or use of the automobile in the business of such employer;

(c) with respect to any hired automobile, to the owner or a lessee thereof, other than the Named Insured, nor to any agent or employee of such owner or lessee;

(d) with respect to any non-owned automobile, to any official or employee if such automobile is owned by him or a member of the same household.

The inclusion hereunder of more than one Insured shall not operate to increase the Company's Limits of Liability.

23. **LIBERALIZATION:** If during the period that insurance is in force under this policy, on behalf of this Company there be adopted or filed with and approved or accepted by the insurance supervisory authorities, all in conformity with law, any changes in the form attached to this policy by which this form of insurance could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the Named Insured hereunder as though such endorsement or substitution of form had been made.

## ENDORSEMENT A

### ANNUAL PREMIUM ADJUSTMENT CLAUSE  SECTION I

Premiums for this policy have been computed on combined total values of:

$119,246,164 on Real and Personal Property and

474 Vehicles

and based on the Annual rate(s) of

$.214 on Real and Personal Property and

$73.42 on Vehicles

At each anniversary of this policy, the insured shall report in writing, to this company or its representatives the total 100% (unless otherwise identified and reported at inception) values insured by this policy.

Premiums will be determined annually for each anniversary based on the  reported values. The premium will only be increased or decreased if such values increase or decrease by 5% from the previous inception or anniversary values.

### AUTOMATIC ACQUISITION CLAUSE FOR SECTION I

This company will automatically cover newly acquired owned property, new construction, or other interests for the limit of liability specified in limits of liability in Section I.  If the values for a new acquisition exceed the limit specified, the insured must immediately report to this company or its representatives the new acquisition.

G/P0001(4/83)

Endorsement 1

Preparation Date: March 21, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No. 500-205228-3.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

It is agreed that Park District Risk Management Association is comprised of the following park districts:

| | | |
|---|---|---|
| Bartlett | Hoffman Estates | Streamwood |
| Batavia | Homewood-Flossmoor | Wheaton |
| Des Plaines | Lombard | Wheeling |
| Dundee Township | Morton Grove | Wilmette |
| Elk Grove | Niles | |
| Elmhurst | Northbrook | |
| Forest Park | Palatine | |
| Glencoe | Park Ridge | |
| Hanover Park | Rockford | |
| Highland Park | Schaumburg | |
| | Skokie | |

_____
Authorized Representative

G/PEND0011                                                    (11/83)

Endorsement 2

Preparation Date March 21, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No. 500-205228-3.

Policy Expiration Date January 1, 1987

Issued To Park District Risk Management Association

By International Insurance Company

## JOINT LOSS AGREEMENT

In the event of damage to or destruction of property, at a location designated in this policy and also designated in a boiler and machinery insurance policy and there is a disagreement between the insurers with respect to:

(1)  whether such damage or destruction was caused by a Peril insured against by this policy or by an Accident insured against by such boiler and machinery insurance policy

or,

(2)  the extent of participation of this policy and of such boiler and machinery insurance policy in a loss which is insured against, partially or wholly, by any or all of said policies.

The Underwriters' shall upon written notice request of the insured, pay to the Insured one-half of the amount of the loss which is in disagreement, but in no event more than the Underwriters would have paid if there had been no boiler and machinery insurance policy in effect, subject to the following conditions:

(1)  The amount of the loss which is in disagreement after making provisions for any undisputed claims payable under the said policies and after the amount of the loss is agreed upon by the insured and the insurers, is limited to the minimum amount remaining payable under either the boiler and machinery or all-risk property or fire policy(ies);

(2)  The boiler and machinery insurer shall simultaneously pay to the Insured one-half of said amount which is in disagreement;

(3)  The payments by the insurers hereunder and acceptance of the same by the insured signify the agreement of the insurers to submit to and proceed with arbitration within 90 days of such payments;

G/PEND008

The arbitrators shall be three in number, one of whom shall be appointed by the boiler and machinery insurer and one of whom shall be appointed by the all-risk property or fire insurer(s) and the third appointed by consent of the other two, and the decision by the arbitrators shall be binding on the insurers and that judgment upon such award may be entered in any court of competent jurisdiction;

(4)   The insured agrees to cooperate in connection with such arbitration but not to intervene therein;

(5)   The provisions of this endorsement shall not apply unless such other policy issued by the boiler and machinery insurance company is similarly endorsed;

and

(6)   Acceptance by the insured of sums paid pursuant to the provisions of this endorsement, including an arbitration award, shall not operate to alter, waive, surrender or in any way affect the rights of the insured against any of the insurers.

This agreement shall become effective on _____, and shall continue in force until the expiration of the boiler and machinery insurance policy or until canceled by either carrier on ten days written notice to the Assured, whichever occurs first.

All other terms and conditions of this policy remain unchanged.

_____
Authorized Representative

G/PEND008

Endorsement 3

Preparation Date: April 12, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No.  500-205228-3.

Policy Expiration Date:  January 1, 1987

Issued To:  Park District Risk Management Association

By:  International Insurance Company

It is agreed that coverage for Fine Arts, in the amount of $7,425, is provided by this policy subject to the terms and conditions of this policy.

_____
Authorized Representative

G/PEND0011

(11/83)

Endorsement 4

Preparation Date: April 12, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No. 500-205228-3.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

It is agreed that coverage for electronic data processing equipment is provided by attached forms G/PEND 005, 006 and 007 in the following amounts:

    EDP Hardware – $1,000,000
    EDP Media – $250,000
    Extra Expense – $250,000

_____
Authorized Representative

(11/83)

G/PEND0011

Preparation Date: April 12, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No. 500-205228-3.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

## DATA PROCESSING SYSTEM EQUIPMENT EXTENSION

This policy is extended to cover the following:

1. **PROPERTY COVERED:** Data processing system including equipment and component parts thereof owned by the Insured or leased, rented or under the control of the Insured.

2. **PROPERTY EXCLUDED:**

   A. Active data processing media which is hereby defined as meaning all forms of converted data and/or program and/or instruction vehicles employed in the Insureds data processing operation;

   B. Accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts, or other documents;

   C. Property rented or leased to others while away from the premises of the Insured.

3. **PERILS INSURED:** Insures against all risks of direct physical loss or damage to the property covered, except as hereinafter provided.

4. **PERILS EXCLUDED:** This Extension does not insure against loss, damage, or expense caused directly or indirectly by:

   A. Damage due to mechanical failure, faulty construction, error in design unless fire or explosion ensues, and then only for loss, damage, or expense caused by such ensuing fire or explosion;

   B. Inherent vice, wear, tear, gradual deterioration or depreciation;

   C. Any dishonest, fraudulent or criminal act by an Insured, a partner therein or an officer, director or trustee thereof, whether acting alone or in collusion with others;

(4/83)

G/PEND005

D.  Dryness or dampness of atmosphere, extremes of temperature, corrosion, rust unless directly resulting from physical damage to the data processing system's air conditioning facilities caused by a peril not excluded by the provisions of this Extension;

E.  Short circuit, blow-out, or other electrical disturbance, other than lightning, within electrical apparatus, unless fire or explosion ensues and then only for loss, damage or expense caused by such ensuing fire or explosion;

F.  Actual work upon the property covered, unless fire or explosion ensues, and then only for loss, damage, or expense caused by such ensuing fire or explosion;

G.  Delay or loss of market;

H.  War risk or nuclear risks as excluded in the Policy to which this Extension is attached.

5.  **VALUATION:**  Replacement Cost - The Company shall not be liable beyond the actual retail replacement cost of the property at the time any loss or damage occurs and the loss or damage shall be ascertained or estimated on the basis of the actual cash retail replacement cost of property similar in kind to that insured at the place of and immediately preceding the time of such loss or damage, but in no event to exceed the limit of liability stipulated in the "Declarations."

6.  **DIFFERENCE IN CONDITIONS:**  It is a condition of this Insurance that the Insured shall file with Arthur J. Gallagher & Co. a copy of any lease or rental agreement pertaining to the property insured hereunder insofar as concerns the lessors' liability for loss or damage to said property, and coverage afforded hereunder shall be only for the difference in conditions between those contained in said lease or rental agreement and the terms of this Extension. The Insured agrees to give the Company thirty days notice of any alteration, cancellation or termination of the above mentioned lease or rental agreement pertaining to the lessors' liability.

Subject otherwise to all terms, clauses and conditions as heretofore.

_____
Authorized Representative

Preparation Date: April 12, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No. 500-205228-3.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

## DATA PROCESSING MEDIA EXTENSION

This policy is extended to cover the following:

1. **PROPERTY INSURED:** Active data processing media, being property of the Insured or property of others for which the Insured may be liable.

2. **PROPERTY EXCLUDED:** This Policy does not insure accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents except as they may be converted to data processing media form, and then only in that form, or any data processing media which cannot be replaced with other of like kind and quality.

3. **PERILS INSURED:** This Extension insures against all risks of direct physical loss or damage to the property covered, except as hereinafter provided.

4. **PERILS EXCLUDED:** This Extension does not insure against loss, damage, or expense resulting from or caused directly or indirectly by:

   A. Data processing media failure or breakdown or malfunction of the data processing system including equipment and component parts while said media is being run through the system, unless fire or explosion ensues and then only for the loss, damage or expense caused by such ensuing fire or explosion.

   B. Electrical or magnetic injury, disturbance or erasure of electronic recordings, except by lightning;

   C. Dryness or dampness of atmosphere, extremes of temperature, corrosion, rust unless directly resulting from physical damage to the data processing system's air conditioning facilities caused by a peril not excluded by the provisions of this Extension;

   D. Delay or loss of market;

G/PEND006                                                              (4/83)

E.   Inherent vice, wear, tear, gradual deterioration or depreciation;

F.   Any dishonest, fradulent or criminal act by an Insured, a partner therein or an officer, director or trustee thereof, whether acting alone or in collusion with others;

G.   War risk or nuclear risks as excluded in the Policy to which this Extension is attached.

5.   **VALUATION:**  The Company shall not be liable beyond the actual reproduction cost of the property; if not replaced or reproduced, blank value of media; all subject to the applicable limit of liability stated in the "Declarations."

6.   **DEFINITIONS:**  The term "active data processing media" wherever used in this policy shall mean all forms of converted data and/or program and/or instruction vehicles employed in the Insured's data processing operation, except all such **UNUSED** property.

Subject otherwise to all terms, clauses and conditions as heretofore.

_____

Authorized Representative

(4/83)

Preparation Date: April 12, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No. 500-205228-3.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

## DATA PROCESSING EXTRA EXPENSE EXTENSION

This policy is extended to cover the following:

1. **SUBJECT OF INSURANCE AND PERILS INSURED:** This Extension insures against the necessary Extra Expense, as hereinafter defined, incurred by the Insured in order to continue as nearly as practicable the normal operation of its business, immediately following damage to or destruction of the data processing system including equipment and component parts thereof and data processing media therefor, owned, leased, against, the air conditioning system or electrical system necessary for the operation of the data processing equipment is so damaged as to reduce or suspend the Insured's ability to actually perform the operations normally performed by the data processing system.

2. **MEASURE OF RECOVERY:** If the above described property is destroyed or so damaged by the perils insured against occurring during the term of this Extension so as to necessitate the incurrence of Extra Expense (as defined in this Extension), the Company shall be liable for the Extra Expense so incurred, not exceeding the actual loss sustained, for not exceeding such length of time, hereinafter referred to as the "period of restoration," commencing with the date of damage or destruction and not limited by the date of expiration of this Extension, as shall be required with the exercise of due diligence and dispatch to repair, rebuild, or replace such part of said property as may be destroyed or damaged.

   It is further agreed that this extension in coverage shall not operate to increase the Company limits of liability hereunder.

3. **EXTRA EXPENSE DEFINITION:** The term "Extra Expense" wherever employed in this Extension is defined as the excess (if any) of the total cost during the period of restoration of the operation of the business over and above the total cost of such operation that would normally have been incurred during the same period had no loss occurred; the cost in each case to include expense of using other property or facilities of other concerns or other necessary emergency expenses. In no event, however, shall Company be liable for loss of profits or earnings resulting from diminution of business, nor for any direct or indirect property damage loss insurable under Property Damage policies, or for expenditures incurred in the purchase, construction, repair or replacement of any physical property unless incurred for the purpose of reducing any loss under this Extension not exceeding, however, the amount in which the loss is so reduced. Any salvage value of property so acquired

G/PEND007                                                          (4/83)

which may be sold or utilized by the Insured upon resumption of normal operations, shall be taken into consideration in the adjustment of any loss hereunder.

4.  **EXCLUSIONS:** It is a condition of the insurance that the against, the Company shall not be liable for Extra Expense incurred as a result of:

A.  Any local or State ordinance or law regulating construction or repair of buildings,

B.  The suspension, lapse or cancellation of any lease, license, contract or order;

C.  Interference at premises by strikers or other persons with repairing or replacing the property damaged or destroyed or with the resumption or continuation of the Insured's occupancy;

D.  Loss or destruction of accounts, bills, evidence of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents except as they may be converted to data processing media form and then only in that form;

E.  Loss of or damage to property rented or leased to others while away from the premises of the Insured;

F.  Error in machine programming or instructions to machine;

G.  Inherent vice, wear, tear, gradual deterioration or depreciation;

H.  Any dishonest, fraudulent or criminal act by the Insured, a partner therein or an officer, director or trustee thereof, whether acting alone or in collusion with others;

I.  Damage due to mechanical failure, faulty construction, error in design unless fire or explosion ensues, and then only for loss, damage, or expense caused by such ensuing fire or explosion;

J.  Short circuit, blow-out, or other electrical disturbance, other than lightning, within electrical apparatus, unless fire or explosion ensues and then only for loss, damage or expense caused by such ensuing fire or explosion;

K.  Delay or loss of market;

L.  War risks or nuclear risks as excluded in the Policy to which this Extension is attached.

5.  **RESUMPTION OF OPERATIONS:** As soon as practicable after any loss the Insured shall resume complete or partial business operations of the insured property and, in so far as practicable, reduce or dispense with such additional charges and expenses as are being incurred.

6.  **INTERRUPTION BY CIVIL AUTHORITY:** This Policy is extended to include necessary Extra Expense incurred by the Insured as covered hereunder, during the

(4/83)

length of time, not exceeding two consecutive weeks, when as a direct result of damage to or destruction of property adjacent to the premises herein described by the peril(s) insured against, access to such described premises is specifically prohibited by order of civil authority.

7.   **DEFINITIONS:** The term "Normal" wherever used in this Extension shall mean: The condition that would have existed had no loss occurred.

All other terms and conditions of this Policy not in conflict herewith remain unchanged.

_____
Authorized Representative

G/PEND007

(4/83)

Endorsement 5

Preparation Date: May 24, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No. 500-205228-3.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

It is agreed that under Section IV, Agreement L is amended to show $2,185,700 as the total 100% gross earnings amount at risk.

It is further agreed that under Section III, Agreements G, H, I and J, the maintenance deductible of $500 is deleted.

All other terms and conditions of this policy remain unchanged.

_S B Vennello_
Authorized Representative

G/PEND0011                                                (11/83)

Endorsement #6

Preparation Date: June 21, 1984

Effective on or after January 1, 1984, this endorsement forms a part of policy No. 500-205228-3.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Agency

By: International Insurance Company

It is agreed that the Maintenance Deductible shown on Page 1 of 26 is amended to $500.

It is further agreed that the Named Insured for this policy shall be Park District Risk Management Agency.

All other terms and conditions of this policy remain unchanged.

_S R Vassello_
**Authorized Representative**

G/PEND0011                                    (11/83)

Endorsement  **#7**

**Preparation Date:** March 1, 1985

**Effective on or after January 1, 1985, this endorsement forms a part of policy No.  500 205 2283.**

**Policy Expiration Date:** January 1, 1987

**Issued To:** Park District Risk Management Agency

**By:** International Insurance Company

In consideration of the renewal premium of $316,000, it is hereby understood and agreed as follows:

   a)    Annual aggregate ultimate net loss, page 1 of 26, is amended to read $300,000.

   b)    Maintenance deductible, page 1 of 26, is amended to read $1,000.

   c)    Real and Personal property values are amended to read $120,138,995.  Vehicle count is amended to read 598.

All other terms and conditions of this policy remain unchanged.

_____
**Authorized Representative**

G/PEND0011                                                              (11/83)

Endorsement **#3**

Preparation Date: March 1, 1985

Effective on or after January 1, 1985, this endorsement forms a part of policy No.  500 205 2283.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Agency

By: International Insurance Company

In consideration of an additional premium of $14,000, it is hereby understood and agreed as follows:

a)  Endorsement #1 is amended to include the following Park Districts:

Clarendon Hills Park District
Lake County Forest Preserve District
Main Niles Association of Special Recreation
Round Lake Area Park District

b)  Annual aggregate ultimate net loss, page 1 of 26, is amended to read $320,000.

c)  Real and Personal property values are amended to read $124,255,360.  Vehicle count is amended to read 668.

All other terms and conditions of this policy remain unchanged.

_S. R. Vassallo_
Authorized Representative

G/PEND0011

(11/83)

Endorsement  #9

Preparation Date:  March 5, 1985

Effective on or after January 17, 1985, this endorsement forms a part of policy No.  500 205 228 3.

Policy Expiration Date:  January 1, 1987

Issued To:  Park District Risk Management Agency

By:  International Insurance Company

In consideration of an additional premium of $200, it is hereby understood and agreed that the fine arts limit is increased to $16,000.

All other terms and conditions of this policy remain unchanged.

_S. R. Vassallo_
_____
Authorized Representative

G/PEND0011                                                                                      (11/83)

Endorsement   #10

Preparation Date: September 19, 1985

Effective on or after July 1, 1985, this endorsement forms a part of policy No.   500
2052283.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

The Named Insured is amended to include:

    Item 30):

    District Name:    Hazel Crest Park District

    District Address:    P.O. Box 86
                      Hazel Crest, IL  60429

The Premium for the period 1-1-85 to 1-1-86 is amended as follows:

| | | |
|---|---|---|
| Additional Annual Premium: | $ | 3,273 |
| Pro Rata Factor: | x | .504 |
| Additional Pro Rata Premium Due: | $ | 1,650 |

The Annual Aggregate Ultimate Net Loss for the period 1-1-85 to 1-1-86 is amended as
follows:

| | | |
|---|---|---|
| Additional Annual Aggregate: | $ | 7,000 |
| Pro Rata Factor: | x | .504 |
| Additional Pro Rata Aggregate: | $ | 3,528 |

In consideration of the premium charged, it is agreed that Specific Excess Property Limits
are provided excess of N/A and scheduled as follows:

Location                                            Excess Limits

Total Pro Rata Policy Premium:    $   320,850

Total Pro Rata Policy Annual Aggregate:   $   323,528

Norman R. Reid
Authorized Representative

G/NInsEndt

(6/85))

Revised
Endorsement   #11

Preparation Date: September 19, 1985

Effective on or after July 1, 1985, this endorsement forms a part of policy No.   500
2052283.

Policy Expiration Date:  January 1, 1987

Issued To:  Park District Risk Management Association

By: International Insurance Company

The Named Insured is amended to include:

    Item 31):

    District Name:  .  Arlington Heights Park District

    District Address:   800 E. Falcon Drive
                     Arlington Heights, IL  60005

The Premium for the period 1-1-85 to 1-1-86 is amended as follows:

    Additional Annual Premium:      $ 46,479
    Pro Rata Factor:                x   .504
    Additional Pro Rata Premium Due:  $ 23,425

The Annual Aggregate Ultimate Net Loss for the period 1-1-85 to 1-1-86 is amended as
follows:

    Additional Annual Aggregate:     $ 24,000
    Pro Rata Factor:                x   .504
    Additional Pro Rata Aggregate:   $ 12,096

In consideration of the premium charged, it is agreed that **Specific Excess Property Limits**
are provided excess of $1,000,000 and scheduled as follows:

| Location | Excess Limits |
| --- | --- |
| Clubhouse | $    22,252 |
| Racquet Club | $2,739,976 |

Total Pro Rata Policy Premium:      $  344,275

Total Pro Rata Policy Annual Aggregate:  $  335,624

                                Norman R. Reid
                            Authorized Representative

G/NInsEndt                                    (6/85))

Revised
Endorsement    #12

Preparation Date: September 19, 1985

Effective on or after July 1, 1985, this endorsement forms a part of policy No. 500
2052283.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

The Named Insured is amended to include:

Item 32:

District Name:    Lisle Park District

District Address:    P.O. Box 368
Lisle, IL  60532

The Premium for the period 1-1-85 to 1-1-86 is amended as follows:

| | |
|---|---|
| Additional Annual Premium: | $ 15,416 |
| Pro Rata Factor: | x    .504 |
| Additional Pro Rata Premium Due: | $ 7,770 |

The Annual Aggregate Ultimate Net Loss for the period 1-1-85 to 1-1-86 is amended as
follows:

| | |
|---|---|
| Additional Annual Aggregate: | $ 19,000 |
| Pro Rata Factor: | x    .504 |
| Additional Pro Rata Aggregate: | $ 9,576 |

In consideration of the premium charged, it is agreed that Specific Excess Property Limits
are provided excess of $1,000,000 and scheduled as follows:

| Location | Excess Limits |
|---|---|
| Community Center | $   362,000 |

| | |
|---|---|
| Total Pro Rata Policy Premium: | $  352,045 |
| Total Pro Rata Policy Annual Aggregate: | $  345,200 |

Norman R. Reid
Authorized Representative

G/NInsEndt

(6/85))

Revised
Endorsement    #13

Preparation Date: September 19, 1985

Effective on or after July 1, 1985, this endorsement forms a part of policy No.  500 2052283.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

The Named Insured is amended to include:

Item 33):

District Name:        Glenview Park District

District Address:    1930 Prairie Street
                     Glenview, IL  60025

The Premium for the period 1-1-85 to 1-1-86 is amended as follows:

| | |
|---|---|
| Additional Annual Premium: | $ 33,733 |
| Pro Rata Factor: | x    .504 |
| Additional Pro Rata Premium Due: | $ 17,001 |

The Annual Aggregate Ultimate Net Loss for the period 1-1-85 to 1-1-86 is amended as follows:

| | |
|---|---|
| Additional Annual Aggregate: | $ 17,000 |
| Pro Rata Factor: | x    .504 |
| Additional Pro Rata Aggregate: | $  8,568 |

In consideration of the premium charged, it is agreed that Specific Excess Property Limits are provided excess of $1,000,000 and scheduled as follows:

| Location | Excess Limits |
|---|---|
| Tennis Building | $  948,500 |
| Ice Rink | 1,298,000 |

| | |
|---|---|
| Total Pro Rata Policy Premium: | $  369,046 |
| Total Pro Rata Policy Annual Aggregate: | $  353,768 |

Norman R. Reid
Authorized Representative

G/NInsEndt                                                                      (6/85))

Revised
Endorsement    #14

Preparation Date: September 19, 1985

Effective on or after July 1, 1985, this endorsement forms a part of policy No.  500
2052283.

Policy Expiration Date: January 1, 1987

Issued To:  Park District Risk Management Association

By: International Insurance Company

The Named Insured is amended to include:

    Item 34):

    District Name:    Addison Park District

    District Address:    120 E. Oak Street
                     Addison, IL  60101

The Premium for the period 1-1-85 to 1-1-86 is amended as follows:

| | |
|---|---|
| Additional Annual Premium: | $ 12,159 |
| Pro Rata Factor: | x  .504 |
| Additional Pro Rata Premium Due: | $  6,128 |

The Annual Aggregate Ultimate Net Loss for the period 1-1-85 to 1-1-86 is amended as
follows:

| | |
|---|---|
| Additional Annual Aggregate: | $ 11,000 |
| Pro Rata Factor: | x  .504 |
| Additional Pro Rata Aggregate: | $  5,544 |

In consideration of the premium charged, it is agreed that Specific Excess Property Limits
are provided excess of N/A and scheduled as follows:

| Location | Excess Limits |
|---|---|
| Community Center | $1,051,175 |

Total Pro Rata Policy Premium:    $  375,174

Total Pro Rata Policy Annual Aggregate:    $  359,312

Norman R. Reid
Authorized Representative

(6/85))

G/NInsEndt

Revised
Endorsement    #15

Preparation Date: September 19, 1985

Effective on or after July 1, 1985, this endorsement forms a part of policy No.  500 2052283.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

The Named Insured is amended to include:

Item 35):

District Name:    Northwest Special Recreation Association

District Address:    3705 Pheasant Drive
Rolling Meadows, IL  60008

The Premium for the period 1-1-85 to 1-1-86 is amended as follows:

Additional Annual Premium:      $   4,771
Pro Rata Factor:             x    .504
Additional Pro Rata Premium Due:    $   2,403

The Annual Aggregate Ultimate Net Loss for the period 1-1-85 to 1-1-86 is amended as follows:

Additional Annual Aggregate:      $   3,000
Pro Rata Factor:             x    .504
Additional Pro Rata Aggregate:    $   1,512

In consideration of the premium charged, it is agreed that Specific Excess Property Limits are provided excess of N/A and scheduled as follows:

Location                                    Excess Limits

Total Pro Rata Policy Premium:      $   377,579

Total Pro Rata Policy Annual Aggregate:    $   360,824

Norman R. Reid
Authorized Representative

G/NInsEndt                                                        (6/85))

Revised
Endorsement    #16

Preparation Date: September 19, 1985

Effective on or after July 1, 1985, this endorsement forms a part of policy No.  500 2052283.

Policy Expiration Date: January 1, 1987

Issued To:  Park District Risk Management Association

By: International Insurance Company


The Named Insured is amended to include:

    Item 36):

    District Name:    Crystal Lake Park District

    District Address:    300 Lake Shore Drive
        Crystal Lake, IL  60014

The Premium for the period 1-1-85 to 1-1-86 is amended as follows:

| | |
|---|---|
| Additional Annual Premium: | $ 11,974 |
| Pro Rata Factor: | x   .504 |
| Additional Pro Rata Premium Due: | $  6,035 |

The Annual Aggregate Ultimate Net Loss for the period 1-1-85 to 1-1-86 is amended as follows:

| | |
|---|---|
| Additional Annual Aggregate: | $ 17,000 |
| Pro Rata Factor: | x   .504 |
| Additional Pro Rata Aggregate: | $  8,568 |

In consideration of the premium charged, it is agreed that Specific Excess Property Limits are provided excess of $1,000,000 and scheduled as follows:

| Location | Excess Limits |
|---|---|
| Tennis Club | $   631,352 |

| | |
|---|---|
| Total Pro Rata Policy Premium: | $  383,614 |
| Total Pro Rata Policy Annual Aggregate: | $  369,392 |


                                              Norman R. Reid
                                              Authorized Representative

                                                  (6/85))

ised
Endorsement   #17

Preparation Date: September 19, 1985

Effective on or after July 1, 1985, this endorsement forms a part of policy No.   500
2052283.

Policy Expiration Date: January 1, 1987

Issued To: Park District Risk Management Association

By: International Insurance Company

The Named Insured is amended to include:

  Item 37):

   District Name:   Huntley Park District

   District Address:   West Side Rt. 47 & Mill Road
                       Huntley, IL  60142

The Premium for the period 1-1-85 to 1-1-86 is amended as follows:

   Additional Annual Premium:        $  2,958
   Pro Rata Factor:                  x    .504
   Additional Pro Rata Premium Due:  $  1,491

The Annual Aggregate Ultimate Net Loss for the period 1-1-85 to 1-1-86 is amended as
follows:

   Additional Annual Aggregate:      $  7,000
   Pro Rata Factor:                  x    .504
   Additional Pro Rata Aggregate:    $  3,528

In consideration of the premium charged, it is agreed that **Specific Excess Property Limits**
are provided excess of N/A and scheduled as follows:

   Location                                         Excess  Limits


   Total Pro Rata Policy Premium:         $  385,105

   Total Pro Rata Policy Annual Aggregate:  $  372,920


                                         Norman R. Reid
                                     Authorized Representative

G/NInsEndt                                                    (6/85))

 

# CERTIFICATE OF INSURANCE

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES LISTED BELOW.

| NAME AND ADDRESS OF AGENCY | COMPANIES AFFORDING COVERAGES |
|---|---|
| ARTHUR J. GALLAGHER & CO.<br>Gould Center, Golf Road<br>Rolling Meadows, Illinois 60008 | COMPANY LETTER **A** International Insurance Company |
| | COMPANY LETTER **B** Integrity Insurance Company |
| NAME AND ADDRESS OF INSURED<br>PARK DISTRICT RISK MANAGEMENT AGENCY<br>Rockford Park District<br>1401 North Second Street<br>Rockford, IL 61107<br>Attn: Mr. Donald Elliott | COMPANY LETTER **C** Safety Mutual Insurance |
| | COMPANY LETTER **D** Fireman's Fund |
| | COMPANY LETTER **E** |

This is to certify that policies of insurance listed below have been issued to the insured named above and are in force at this time.

| COMPANY LETTER | TYPE OF INSURANCE | POLICY NUMBER | POLICY EXPIRATION DATE | Limits of Liability in Thousands (000) | | |
|---|---|---|---|---|---|---|
| | | | | | EACH OCCURRENCE | AGGREGATE |
| A | **GENERAL LIABILITY**<br>☒ COMPREHENSIVE FORM<br>☒ PREMISES - OPERATIONS<br>☒ EXPLOSION AND COLLAPSE HAZARD<br>☒ UNDERGROUND HAZARD<br>☒ PRODUCTS/COMPLETED OPERATIONS HAZARD<br>☒ CONTRACTUAL INSURANCE<br>☒ BROAD FORM PROPERTY DAMAGE<br>☒ INDEPENDENT CONTRACTORS<br>☒ PERSONAL INJURY | 500 205 2283 | 1-1-87 | BODILY INJURY $<br><br>PROPERTY DAMAGE $<br><br>BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 1,000<br><br>PERSONAL INJURY | | $<br><br>$<br><br>1,000<br><br>$ 1,000 |
| A | **AUTOMOBILE LIABILITY**<br>☒ COMPREHENSIVE FORM<br>☒ OWNED<br>☒ HIRED<br>☒ NON-OWNED | 500 205 2283 | 1-1-87 | BODILY INJURY (EACH PERSON) $<br>BODILY INJURY (EACH OCCURRENCE) $<br>PROPERTY DAMAGE $<br>BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 1,000 | | |
| B | **EXCESS LIABILITY**<br>☒ UMBRELLA FORM<br>☐ OTHER THAN UMBRELLA FORM | ISX 905529 | 12-31-85 | BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 10,000 | | 10,000 |
| C | **WORKERS' COMPENSATION** and **EMPLOYERS' LIABILITY** | AGC-1106-IL | 1-1-87 | STATUTORY<br>$ | | 100 (EACH ACCIDENT) |
| A | Excess Liability | 5220537453 | 12-31-85 | $10,000,000 XS $10,000,000 | | |
| D | Excess Liability | XLX 168 63 36 | 1-1-86 | $ 5,000,000 XS $20,000,000 | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES
Additional Insured does not apply to Workers Compensation Coverage.
Additional Insured August 13, 1985 (Renting rain site for Big Twist and The Mellow Fellows)

Cancellation: Should any of the above described policies be cancelled before the expiration date thereof, the issuing company will endeavor to mail __10__ days written notice to the below named certificate holder, but failure to mail such notice shall impose no obligation or liability of any kind upon the company.

| NAME AND ADDRESS OF CERTIFICATE HOLDER:<br>Kerasotes Theatres, Inc. | DATE ISSUED: June 4, 1985 |
|---|---|
| | AUTHORIZED REPRESENTATIVE |

A-203 (REV. 2-78)    If you have any questions, call: John Durkin 228-3543

 

# CERTIFICATE OF INSURANCE

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.
THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES LISTED BELOW.

| NAME AND ADDRESS OF AGENCY | COMPANIES AFFORDING COVERAGES | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO. Gould Center, Golf Road Rolling Meadows, Illinois 60008 | COMPANY LETTER **A** | International Insurance Company |
| | COMPANY LETTER **B** | Integrity Insurance Company |
| NAME AND ADDRESS OF INSURED PARK DISTRICT RISK MANAGEMENT AGENCY Rockford Park District 1401 North Second Street Rockford, IL 61107 Attn: Mr. Donald Elliott | COMPANY LETTER **C** | Safety Mutual Insurance |
| | COMPANY LETTER **D** | Fireman's Fund |
| | COMPANY LETTER **E** | |

This is to certify that policies of insurance listed below have been issued to the insured named above and are in force at this time.

| COMPANY LETTER | TYPE OF INSURANCE | POLICY NUMBER | POLICY EXPIRATION DATE | Limits of Liability in Thousands (000) | EACH OCCURRENCE | AGGREGATE |
|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** ☒ COMPREHENSIVE FORM ☒ PREMISES - OPERATIONS ☒ EXPLOSION AND COLLAPSE HAZARD ☒ UNDERGROUND HAZARD ☒ PRODUCTS/COMPLETED OPERATIONS HAZARD ☒ CONTRACTUAL INSURANCE ☒ BROAD FORM PROPERTY DAMAGE ☒ INDEPENDENT CONTRACTORS ☒ PERSONAL INJURY | 500 205 2283 | 1-1-87 | BODILY INJURY | $ | $ |
| | | | | PROPERTY DAMAGE | $ | $ |
| | | | | BODILY INJURY AND PROPERTY DAMAGE COMBINED | $ 1,000 | $ 1,000 |
| | | | | PERSONAL INJURY | | $ 1,000 |
| A | **AUTOMOBILE LIABILITY** ☒ COMPREHENSIVE FORM ☒ OWNED ☒ HIRED ☒ NON-OWNED | 500 205 2283 | 1-1-87 | BODILY INJURY (EACH PERSON) | $ | |
| | | | | BODILY INJURY (EACH OCCURRENCE) | $ | |
| | | | | PROPERTY DAMAGE | $ | |
| | | | | BODILY INJURY AND PROPERTY DAMAGE COMBINED | $ 1,000 | |
| B | **EXCESS LIABILITY** ☒ UMBRELLA FORM ☐ OTHER THAN UMBRELLA FORM | ISX 905529 | 12-31-85 | BODILY INJURY AND PROPERTY DAMAGE COMBINED | $ 10,000 | $ 10,000 |
| C | **WORKERS' COMPENSATION and EMPLOYERS' LIABILITY** | AGC-1106-IL | 1-1-87 | STATUTORY | $ 100 EACH ACCIDENT | |
| A | Excess Liability | 5220537453 | 12-31-85 | $10,000,000 XS $10,000,000 | | |
| D | Excess Liability | XLX 168 63 36 | 1-1-86 | $ 5,000,000 XS $20,000,000 | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES
Additional Insured does not apply to Workers Compensation Coverage.
Additional Insured: Beattie Is  June 20-23 (Cosponsored by District)

**Cancellation:** Should any of the above described policies be cancelled before the expiration date thereof, the issuing company will endeavor to mail ___10___ days written notice to the below named certificate holder, but failure to mail such notice shall impose no obligation or liability of any kind upon the company.

| NAME AND ADDRESS OF CERTIFICATE HOLDER: Arts, Inc. c/o Susan Puls First National Bank 401 East State Street Rockford, IL 61104 | DATE ISSUED: June 4, 1985 |
|---|---|
| | AUTHORIZED REPRESENTATIVE |

A-203 (REV. 2-78)    If you have any questions, call: John Durkin 228-3543

  

## CERTIFICATE OF INSURANCE

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.
THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES LISTED BELOW.

**NAME AND ADDRESS OF AGENCY**
ARTHUR J. GALLAGHER & CO.
Gould Center, Golf Road
Rolling Meadows, Illinois 60008

**NAME AND ADDRESS OF INSURED**
PARK DISTRICT RISK MANAGEMENT AGENCY
Rockford Park District
1401 North Second Street
Rockford, IL 61107
Attn: Mr. Donald Elliott

**COMPANIES AFFORDING COVERAGES**

| | |
|---|---|
| COMPANY LETTER A | International Insurance Company |
| COMPANY LETTER B | Integrity Insurance Company |
| COMPANY LETTER C | Safety Mutual Insurance |
| COMPANY LETTER D | Fireman's Fund |
| COMPANY LETTER E | |

This is to certify that policies of insurance listed below have been issued to the insured named above and are in force at this time.

| COMPANY LETTER | TYPE OF INSURANCE | POLICY NUMBER | POLICY EXPIRATION DATE | Limits of Liability in Thousands (000) | |
|---|---|---|---|---|---|
| | | | | EACH OCCURRENCE | AGGREGATE |
| A | **GENERAL LIABILITY** ☒ COMPREHENSIVE FORM ☒ PREMISES - OPERATIONS ☒ EXPLOSION AND COLLAPSE HAZARD ☒ UNDERGROUND HAZARD ☒ PRODUCTS/COMPLETED ☒ CONTRACTUAL INSURANCE ☒ BROAD FORM PROPERTY DAMAGE ☒ INDEPENDENT CONTRACTORS ☒ PERSONAL INJURY | 500 205 2283 | 1-1-87 | BODILY INJURY $ <br> PROPERTY DAMAGE $ <br> BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 1,000 <br> PERSONAL INJURY $ | $ <br> $ <br> $ 1,000 <br> $ 1,000 |
| A | **AUTOMOBILE LIABILITY** ☒ COMPREHENSIVE FORM ☒ OWNED ☒ HIRED ☒ NON-OWNED | 500 205 2283 | 1-1-87 | BODILY INJURY (EACH PERSON) $ <br> BODILY INJURY (EACH OCCURRENCE) $ <br> PROPERTY DAMAGE $ <br> BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 1,000 | |
| B | **EXCESS LIABILITY** ☒ UMBRELLA FORM ☐ OTHER THAN UMBRELLA FORM | ISX 905529 | 12-31-85 | BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 10,000 | $ 10,000 |
| C | **WORKERS' COMPENSATION and EMPLOYERS' LIABILITY** | AGC-1106-IL | 1-1-87 | STATUTORY <br> $ | $ 100 EACH ACCIDENT |
| A | Excess Liability | 522053 7453 | 12-31-85 | $10,000,000 XS $10,000,000 | |
| D | Excess Liability | XLX 168 63 36 | 1-1-86 | $ 5,000,000 XS $20,000,000 | |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES**
Additional Insured does not apply to Workers Compensation Coverage.
Additional Insured: Beattie is June 20-23 (Cosponsored by District)

**Cancellation:** Should any of the above described policies be cancelled before the expiration date thereof, the issuing company will endeavor to mail ___10___ days written notice to the below named certificate holder, but failure to mail such notice shall impose no obligation or liability of any kind upon the company.

**NAME AND ADDRESS OF CERTIFICATE HOLDER:**
City of Rockford
City Hall
425 East State Street
Rockford, IL 61104

DATE ISSUED: June 8, 1984

AUTHORIZED REPRESENTATIVE

A-203 (REV. 2-78)

If you have any questions, call: John Durkin 228-3543



RECEIVED
OCT 2 5 1985
U. S. INSURANCE GROUP
CHICAGO REGIONAL OFFICE

# CERTIFICATE OF INSURANCE

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.
THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES LISTED BELOW.

**NAME AND ADDRESS OF AGENCY**

ARTHUR J. GALLAGHER & CO.
Gould Center, Golf Road
Rolling Meadows, Illinois 60008

**NAME AND ADDRESS OF INSURED**

PARK DISTRICT RISK MANAGEMENT AGENCY
Rockford Park District
1401 North Second Street
Rockford, IL 61107
Attn: Mr. Donald Elliott

**COMPANIES AFFORDING COVERAGES**

| | |
|---|---|
| COMPANY LETTER **A** | International Insurance Company |
| COMPANY LETTER **B** | Integrity Insurance Company |
| COMPANY LETTER **C** | Safety Mutual Insurance |
| COMPANY LETTER **D** | Fireman's Fund |
| COMPANY LETTER **E** | |

This is to certify that policies of insurance listed below have been issued to the insured named above and are in force at this time.

| COMPANY LETTER | TYPE OF INSURANCE | POLICY NUMBER | POLICY EXPIRATION DATE | Limits of Liability in Thousands (000) | | |
|---|---|---|---|---|---|---|
| | | | | | EACH OCCURRENCE | AGGREGATE |
| A | **GENERAL LIABILITY**<br>☒ COMPREHENSIVE FORM<br>☒ PREMISES - OPERATIONS<br>☒ EXPLOSION AND COLLAPSE HAZARD<br>☒ UNDERGROUND HAZARD<br>☒ PRODUCTS/COMPLETED<br>☒ CONTRACTUAL INSURANCE<br>☒ BROAD FORM PROPERTY DAMAGE<br>☒ INDEPENDENT CONTRACTORS<br>☒ PERSONAL INJURY | 500 205 2283 | 1-1-87 | BODILY INJURY $<br><br>PROPERTY DAMAGE $<br><br><br>BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 1,000<br><br>PERSONAL INJURY | | $<br><br>$<br><br><br>$ 1,000<br><br>$ 1,000 |
| A | **AUTOMOBILE LIABILITY**<br>☒ COMPREHENSIVE FORM<br>☒ OWNED<br>☒ HIRED<br>☒ NON-OWNED | 500 205 2283 | 1-1-87 | BODILY INJURY (EACH PERSON) $<br>BODILY INJURY (EACH OCCURRENCE) $<br>PROPERTY DAMAGE $<br>BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 1,000 | | |
| B | **EXCESS LIABILITY**<br>☒ UMBRELLA FORM<br>☐ OTHER THAN UMBRELLA FORM | ISX 905529 | 12-31-85 | BODILY INJURY AND PROPERTY DAMAGE COMBINED $ 10,000 | | $ 10,000 |
| C | **WORKERS' COMPENSATION and EMPLOYERS' LIABILITY** | AGC-1106-IL | 1-1-87 | STATUTORY<br><br>$ 100 (EACH ACCIDENT) | | |
| A | Excess Liability | 5220537453 | 12-31-85 | $10,000,000 XS $10,000,000 | | |
| D | Excess Liability | XLX 168 63 36 | 1-1-86 | $ 5,000,000 XS $20,000,000 | | |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES**

Additional Insured does not apply to Workers Compensation Coverage.
Additional Insured ATIMA to a 1983 Dodge 15 Passenger Van Fleet #20  S# 2B5WB31W8DK316199 or 1984
Dodge Passenger Van Fleet 24  S# 2B5WB31WEK287938 June 26 – August 9.

**Cancellation:** Should any of the above described policies be cancelled before the expiration date thereof, the issuing company will endeavor to mail ___10___ days written notice to the below named certificate holder, but failure to mail such notice shall impose no obligation or liability of any kind upon the company.

**NAME AND ADDRESS OF CERTIFICATE HOLDER:**

Rockton Bus Company
720 North Blacktop Garage
Rockton, IL  60172

DATE ISSUED:          June 21, 1985

AUTHORIZED REPRESENTATIVE

A-203 (REV. 2-78)          If you have any questions, call: John Durkin  228-3543

EXHIBIT
B

FILED

Date: DEC 2 8 2005

*Marc A. Gasparini*

Clerk of the Circuit Court

By _____ Deputy
Winnebago County, IL

IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
WINNEBAGO COUNTY, ILLINOIS
CHANCERY DIVISION

PEOPLE OF THE STATE OF ILLINOIS,        )
*ex rel.* Lisa Madigan, Attorney General  )
of the State of Illinois,               )
                                        )
        Plaintiff,                      )
                                        )        05MR 452
        -vs-                            )
                                        )
ROCKFORD PARK DISTRICT, an Illinois Unit )
of Local Government,                    )
                                        )
        Defendant.                      )

## COMPLAINT

    Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* LISA

MADIGAN, Attorney General of the State of Illinois, complains of

Defendant, ROCKFORD PARK DISTRICT ("Park District") as follows:

### COUNT I - COST RECOVERY

    1.    This Complaint is brought pursuant to Section 22.2 of the

Illinois Environmental Protection Act ("Act"), 415 ILCS 5/22.2

(2004), by LISA MADIGAN, Attorney General of the State of Illinois,

on her own motion on behalf of the People of the State of Illinois

and at the request of the Illinois Environmental Protection Agency

("Illinois EPA"), pursuant to Sections 42(d) and (e) of the Act, 415

ILCS 5/42(d) and (e) (2004), and is an action to recover the

removal and/or remedial costs incurred by the People of the State

of Illinois as a result of a release or substantial threat of

release of hazardous substances from a facility known as Sand Park.

    2.    The Illinois EPA is an administrative agency of the State

- 1 -


EXHIBIT
C

of Illinois, created by Section 4 of the Act, 415 ILCS 5/4 (2004), and is charged, *inter alia*, with the duty of enforcing the Act.

3.    The defendant Park District is an Illinois Unit of Local Government organized pursuant to the Park District Act, 70 ILCS 1205/1-1 *et seq.* (2004).

4.    The Site is approximately forty acres in size and is located south of Riverside Boulevard near the intersection with Heart Boulevard, approximately one and one-half miles east of the Rock River, in Loves Park, Winnebago County, Illinois. (Hereinafter referred to as the "Site").

5.    The Site's legal description is the north ½ of the southeast ¼ of Section 6, Township 44 North, Range 2 East.

6.    Sand and gravel quarry operations took place at the Site in the 1930s and early 1940s.

7.    The defendant Park District purchased the Site in approximately 1941 for use as a city park.

8.    Prior to the construction of the park, the Site was used as a municipal landfill.

9.    Landfill operations began in the 1950s and beginning in approximately 1966, the landfill was operated by Rockford Disposal which was purchased by BFI of Illinois in approximately 1969.

10.    Landfilling operations at the Site ceased in approximately 1972.

11.    Beginning in 1982 volatile organic compounds ("VOCs") were detected in the Loves Park Municipal Well No. 2, which is located

2

in the southwest corner of the Site.

12. In response to the detection of the VOCs in the municipal well in 1983 the Illinois EPA installed monitoring wells on and down-gradient of the Site.

13. In 1984, during a sampling event of these monitoring wells conducted by the Illinois EPA contractor, Ecology and Environment, VOCs, benzene, chlorobenzene, naphthalene, toluene, ethylbenzene and xylene were detected at elevated levels.

14. Further investigation of the Site took place in August of 1995. This included the collection of groundwater samples which detected both volatile and inorganic constituents that exceeded the Maximum Contaminant Level ("MCL") for drinking water. The contaminants included vinyl chloride, benzene and toluene. Also collected was a surface soil sample which contained polynuclear aromatic compounds ("PNAs") at concentrations exceeding Illinois EPA remediation clean-up objectives. One compound benzo(a)pyrene exceeded the Cancer Risk Evaluation Guide("CREG") Comparison Value set by the Agency for Toxic Substances and Disease Registry.

15. In April of 1996, five additional groundwater monitoring wells were installed at the Site. Both VOCs and metals were detected in the groundwater taken from these wells.

16. In July of 1997, five additional groundwater monitoring wells were installed at the Site.

17. The Plaintiff has and continues to incur costs in performing remedial actions at the Site.

18. Section 22.2(f) of the Act, 415 ILCS 5/22.2(f) (2004),

3

provides in pertinent part as follows:

    f.    Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in Subsection (j) of this Section, the following persons shall be liable for all costs of removal or remedial action incurred by the State of Illinois or any unit of local government as a result of a release or substantial threat of a release of a hazardous substance or pesticide:

    1.    The owner and operator of a facility or vessel from which there is a release or a substantial threat of release of a hazardous substance or pesticide;

    2.    Any person who at the time of disposal, transport, storage or treatment of a hazardous substance or pesticide owned or operated the facility or vessel used for such disposal, transport, treatment or storage from which there was a release or substantial threat of a release of any such hazardous substance or pesticide;

    *    *    *

    4.    Any person who accepts or accepted any hazardous substances or pesticides for transport or disposal, storage or treatment facilities or sites from which there is a release or substantial threat of a release of a hazardous substance or pesticide.

19.   Sections 3.215, 3.315, 3.395, 3.400 and 3.405 of the Act, 415 ILCS 5/3.215, 5/3.315, 5/3.395, 5/3.400 and 5/3.405 (2004), provide the following definitions:

Section 3.215

"HAZARDOUS SUBSTANCE" means: (A) any substance designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act (P.L. 92-500), as amended, (B) an element, compound, mixture, solution, or substance designated pursuant to Section 102 of the comprehensive Environmental Response, Compensation and Liability Act of 1980 (P.L. 96-510), as amended, (C) any hazardous waste, (D) any toxic pollutant listed under Section 307(a) of the Federal Water Pollution Control Act (P.L. 92-500), as

4

amended, (E) any hazardous air pollutant listed under Section 112 of the Clean Air Act (P.L. 95-95), as amended, (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator of the U.S. Environmental Protection Agency has taken action pursuant to Section 7 of the Toxic Substances Control Act (P.L. 94-469), as amended. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel or mixtures of natural gas and such synthetic gas.

Section 3.315

"PERSON" is any individual, partnership, co-partnership, firm, company, corporation, association, joint stock company, trust, estate, political subdivision, state agency, or any other legal entity, or their legal representative, agent or assigns.

Section 3.395

"RELEASE" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, but excludes (a) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons; (b) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine; (c) release of source, byproduct, or special nuclear material fro a nuclear incident, s those items are defined in the Atomic Energy Act of 19054, if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under Section 170 of such Act; and (d) the normal application of fertilizer.

Section 3.400

"REMEDIAL ACTION" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to,

5

such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. . . . The term includes offsite transport of hazardous substances, or the storage, treatment, destruction or secure disposition offsite of such hazardous substances or contaminated materials.

Section 3.405

"REMOVE" or "REMOVAL" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, which may otherwise result from a release or threat of release. . . .

20.  Section  22.2(h)(1)and  (2)  of  the  Act,  415  ILCS 5/22.2(h)(1)and  (2)  (2004),  provides,  in  pertinent  part,  the following definitions:

h.    For purposes of this Section:

1.    The term "facility" means:

A.    any building, structure, installation, equipment, pipe or pipeline including but not limited to any pipe into a sewer or publicly owned treatment works, well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft;

B.    any site or area where a hazardous substance has been deposited, stored,

6

disposed of, or placed, or otherwise come
to be located;

2.  The term "owner or operator" means:
    A.  Any person owning or operating a vessel
        or facility;

\*          \*          \*

21.  The defendant Park District is an owner of a facility as
that term is defined in Section 22.2(h)(2)(A) of the Act, 415 ILCS
22.2(h)(2)(A) (2004).

22.  The defendant is a "person" as that term is defined in
Section 3.315 of the Act, 415 ILCS 5/3.315 (2004).

23.  The Site constitutes a "facility" as that term is defined
in Section 22.2(h)(1)(A) and (B) of the Act, 415 ILCS
5/22.2(h)(1)(A) and (B) (2004).

24.  The contaminants detected in the groundwater from the
Site are "hazardous substances" within the meaning of Sections
22.2(f) and 3.215 of the Act, 415 ILCS 5/22.2(f) and 5/3.215
(2004).

25.  The spilling, leaking, discharging, depositing,
disposing, placing or otherwise locating hazardous substances at
the Site constitutes a "release" within the meaning of Sections
22.2(f) and 3.395 of the Act, 415 ILCS 5/22.2(f) and 5/3.395
(2004).

26.  The Illinois EPA has engaged in the remediation and
removal of released hazardous substances from the environment at
the Site, including such actions as were necessary to monitor,
assess, and evaluate the release or threat of release of hazardous

7

substances and as were necessary to prevent, minimize or mitigate damage to the public health or welfare or the environment which may otherwise result from the release and threat of release of hazardous substances at the Site.

27. The remediation and removal of released hazardous substances by the Illinois EPA at the Site constitutes "remedial action" or "removal" within the meaning of Sections 3.400, 3.405 and 22.2(f) of the Act, 415 ILCS 5/3.400, 5/3.405 and 5/22.2(f) (2004).

28. Plaintiff has incurred certain costs in connection with the removal and remedial actions, including but not limited to, soil and groundwater sampling, investigation and administrative expenditures, and other actions necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances and minimize or mitigate damage to the public health or welfare or the environment related to the release or substantial threat of release from the facility.

29. The defendant, as a person who owned or operated a facility from which there is a release or a substantial threat of a release of hazardous substances, is jointly and severally liable pursuant to Section 22.2(f) of the Act, for all costs of removal and remedial action incurred by the State of Illinois prior to July 1, 1996 as a result of the release or substantial threat of release of hazardous substances at the Site and are severally liable for all costs incurred on or after July 1, 1996.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS,

8

respectfully requests the Court to enter an order in favor of Plaintiff and against the Defendant and grant the following relief:

1.   Finding that the defendants is jointly and severally liable for costs of removal or remedial action incurred by the Plaintiff through June 30, 1996, pursuant to Section 22.2(f) of the Act;

2.   Finding that defendant is liable for their proportionate share of costs of removal or remedial actions incurred by the State after June 30, 1996;

3.   Assessing joint and several liability for all removal and remedial action costs incurred by the Plaintiff prior to July 1, 1996 against defendant;

4.   Assessing liability for costs incurred by the State after June 30, 1996 for removal or remedial actions undertaken by the State to address the release of hazardous substances proximately caused by defendant;

5.   Assessing all costs of this proceeding pursuant to Section 42(f) of the Act, including expert witness and attorney fees, against the defendant; and

6.   Granting such other relief as the Court deems just and equitable.

## COUNT II - WATER POLLUTION

1.   This Count is brought by the Attorney General on his own motion pursuant to the terms and provisions of Section 42 (d) and (e) of the Act, 415 ILCS 5/42 (d) and (e) (2004) against the

9

defendant Rockford Park District.

2-16.    Plaintiff realleges and incorporates by reference herein paragraphs 2 through 16 of Count I as paragraphs 2 through 16 of this Count II.

17.    Section 12(a) of the Act, 415 ILCS 5/12(a) (2004), provides as follows:

No person shall:

a.    Cause or threaten or allow the discharge of any contaminant into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources . . .

18.    Section 3.165 of the Act, 415 ILCS 5/3.165 (2004), defines contaminant as:

"CONTAMINANT" is any solid, liquid, or gaseous matter, any odor, or any form of energy, from whatever source.

19.    VOCs, benzene, chlorobenzene, napthalene, toluene, ethylbenzene, vinyl chloride and xylene are contaminants as that term is defined in Section 3.165 of the Act.

20.    Section 3.545 of the Act, 415 ILCS 5/3.545 (2004), defines "water pollution" as follows:

"WATER POLLUTION" is such alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the State, or such discharge of any contaminant into any waters of the State, as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life.

21.    Section 3.550 of the Act, 415 ILCS 5/3.550 (2004),

defines "waters" as follows:

> "WATERS" means all accumulations of water, surface and underground, natural, and artificial, public and private, or parts thereof, which are wholly or partially within, flow through, or border upon this State.

22. The groundwater underlying the Site is a water of the State of Illinois as that term is defined in Section 3.550 of the Act, 415 ILCS 5/3.550 (2004).

23. By causing, threatening or allowing the release of VOCs at the Site which subsequently entered the groundwater underlying the Site, Defendant, Park District, caused, threatened or allowed the discharge of a contaminant into the environment.

24. By causing, threatening or allowing the discharge of a contaminant into the environment, Defendant, Park District, caused or tended to cause water pollution in Illinois.

25. By causing or tending to cause water pollution in Illinois, Defendant, Park District, thereby violated Section 12(a) of the Act.

26. Plaintiff is without an adequate remedy at law. Plaintiff will be irreparably injured and violations of the relevant environmental statutes and regulations will continue unless and until this court grants equitable relief in the form of preliminary and, after trial, permanent injunctive relief.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this court enter an order granting a preliminary injunction and, after trial, a permanent injunction, in

favor of Plaintiff and against Defendant, Rockford Park District on this Count II:

1.    Finding that Defendant, Rockford Park District violated 415 ILCS 5/12(a) (2004);

2.    Enjoining Defendant, Rockford Park District from any future violations of 415 ILCS 5/12(a) (2004);

3.    Ordering Defendant, Rockford Park District to take the appropriate corrective action that will result in the abatement of the violations alleged herein;

4.    Assessing against Defendant, Rockford Park District, pursuant to 415 ILCS 5/42(a) (2004), a civil penalty of Fifty Thousand Dollars ($50,000.00) for each and every violation of the Act, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day during which each violation continued;

5.    Assessing against Defendant, Rockford Park District all costs including attorney, expert witness, and consultant fees expended by the State in its pursuit of this action; and

6. Granting such other relief as this court deems appropriate and just.

<div style="margin-left:40%">

PEOPLE OF THE STATE OF ILLINOIS,
*ex rel.* LISA MADIGAN,
Attorney General of the
State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos
   Litigation Division
Assistant Attorney General

By: _____
ROSEMARIE CAZEAU, Chief
Environmental Bureau
Assistant Attorney General

</div>

*OF COUNSEL:*
Gerald T. Karr
Senior Assistant Attorney General
Environmental Bureau
188 W. Randolph St., 20th Flr.
Chicago, IL 60601
(312) 814-3369

<div style="text-align:center">13</div>

IN THE CIRCUIT COURT FOR THE SEVENTEENTH JUDICIAL CIRCUIT
WINNEBAGO COUNTY, ILLINOIS
CHANCERY DIVISION



PEOPLE OF THE STATE OF ILLINOIS,　　　)
ex rel. Lisa Madigan, Attorney General　)
of the State of Illinois,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　-vs-　　　　　　　　　　　) 　05 MR 452
　　　　　　　　　　　　　　　　　　)
ROCKFORD PARK DISTRICT, an Illinois Unit　)
of Local Government and BFI WASTE SYSTEMS　)
OF NORTH AMERICA, INC., a Delaware　　)
Corporation,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)

### FIRST AMENDED COMPLAINT

Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* LISA

MADIGAN, Attorney General of the State of Illinois, complains of

Defendants, ROCKFORD PARK DISTRICT ("Park District") and BFI WASTE

SYSTEMS OF NORTH AMERICA, INC.,("BFINA")(hereinafter "Defendants"),

as follows:

### COUNT I - COST RECOVERY

1.　This Complaint is brought pursuant to Section 22.2

of the Illinois Environmental Protection Act ("Act"), 415 ILCS

5/22.2 (2006), by LISA MADIGAN, Attorney General of the State of

Illinois, on her own motion and on behalf of the People of the

State of Illinois and at the request of the Illinois Environmental

Protection Agency ("Illinois EPA"), and is an action to recover the

removal and/or remedial costs incurred by the People of the State

- 1 -



of Illinois as a result of a release or substantial threat of release of hazardous substances from a facility known as Sand Park.

2. The Illinois EPA is an administrative agency of the State of Illinois, created by Section 4 of the Act, 415 ILCS 5/4 (2006), and is charged, *inter alia*, with the duty of enforcing the Act.

3. The Defendant Park District is an Illinois Unit of Local Government organized pursuant to the Park District Act, 70 ILCS 1205/1-1 *et seq.* (2006).

4. The Defendant BFINA is a Delaware corporation in good standing, and authorized to conduct business in the State of Illinois.

5. The property which is the subject of this lawsuit is approximately forty acres in size and is located south of Riverside Boulevard near the intersection with Heart Boulevard, approximately one and one-half miles east of the Rock River, in Loves Park, Winnebago County, Illinois (hereinafter referred to as the "Site").

6. The Site's legal description is the north ½ of the southeast ¼ of Section 6, Township 44 North, Range 2 East.

7. Sand and gravel quarry operations took place at the Site in the 1930s and early 1940s.

8. The Defendant Park District purchased the Site in approximately 1941 for use as a city park.

9. Prior to the construction of the park, the Site was used

-2-

as a municipal landfill.

10.   Landfill operations began in the 1950s and beginning in approximately 1966, the landfill was operated by Rockford Disposal which was purchased by Defendant BFINA in approximately 1969.

11.   Defendant BFINA continued to operate the Site as a landfill until approximately 1972.

12.   Beginning in 1982, volatile organic compounds ("VOCs") were detected in the Loves Park Municipal Well No. 2 which is located in the southwest corner of the Site.

13.   In response to the detection of the VOCs in the municipal well in 1983 the Illinois EPA installed monitoring wells down-gradient of the Site.

14.   In 1984, during a sampling event of the above-mentioned monitoring wells conducted by the Illinois EPA contractor, VOCs, benzene, chlorobenzene, naphthalene, toluene, ethylbenzene and xylene were detected at elevated levels.

15.   Further investigation of the Site took place in August of 1995, which included the collection of soil samples and groundwater samples and detected both volatile and inorganic constituents that exceeded the Maximum Contaminant Level for drinking water.   These constituents included vinyl chloride, benzene and toluene.

16.   In April of 1996, five additional groundwater monitoring wells were installed at the Site.   Both VOCs and metals were

-3-

detected in the groundwater taken from these wells.

17. In July of 1997, five additional groundwater monitoring wells were installed at the Site.

18. The Plaintiff has and continues to incur costs in performing remedial actions at the Site.

19. Section 22.2(f) of the Act, 415 ILCS 5/22.2(f) (2006), provides in pertinent part as follows:

> f. Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in Subsection (j) of this Section, the following persons shall be liable for all costs of removal or remedial action incurred by the State of Illinois or any unit of local government as a result of a release or substantial threat of a release of a hazardous substance or pesticide:
>
> 1. The owner and operator of a facility or vessel from which there is a release or a substantial threat of release of a hazardous substance or pesticide;
>
> 2. Any person who at the time of disposal, transport, storage or treatment of a hazardous substance or pesticide owned or operated the facility or vessel used for such disposal, transport, treatment or storage from which there was a release or substantial threat of a release of any such hazardous substance or pesticide;

           \*    \*     \*

20. Sections 3.215, 3.315, 3.395, 3.400 and 3.405 of the Act, 415 ILCS 5/3.215, 5/3.315, 5/3.395, 5/3.400 and 5/3.405 (2006), provide the following definitions:

**Section 3.215**

"HAZARDOUS SUBSTANCE" means: (A) any substance designated

-4-

pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act (P.L. 92-500), as amended, (B) an element, compound, mixture, solution, or substance designated pursuant to Section 102 of the comprehensive Environmental Response, Compensation and Liability Act of 1980 (P.L. 96-510), as amended, (C) any hazardous waste, (D) any toxic pollutant listed under Section 307(a) of the Federal Water Pollution Control Act (P.L. 92-500), as amended, (E) any hazardous air pollutant listed under Section 112 of the Clean Air Act (P.L. 95-95), as amended, (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator of the U.S. Environmental Protection Agency has taken action pursuant to Section 7 of the Toxic Substances Control Act (P.L. 94-469), as amended.  The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel or mixtures of natural gas and such synthetic gas.

## Section 3.315

"PERSON" is any individual, partnership, co-partnership, firm, company, corporation, association, joint stock company, trust, estate, political subdivision, state agency, or any other legal entity, or their legal representative, agent or assigns.

## Section 3.395

"RELEASE" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, but excludes (a) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons; (b) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine; (c) release of source, byproduct, or special nuclear material fro a nuclear incident, s those items are defined in the Atomic Energy Act of 19054, if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under Section 170 of such Act; and (d) the normal application of fertilizer.

-5-

**Section 3.400**

"REMEDIAL ACTION" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. . . The term includes offsite transport of hazardous substances, or the storage, treatment, destruction or secure disposition offsite of such hazardous substances or contaminated materials.

**Section 3.405**

"REMOVE" or "REMOVAL" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, which may otherwise result from a release or threat of release. . . . .

21.　Section 22.2(h)(1)and (2) of the Act, 415 ILCS

-6-

5/22.2(h)(1)and (2) (2006), provides, in pertinent part, the following definitions:

    h.   For purposes of this Section:

       1.   The term "facility" means:

          A.   any building, structure, installation, equipment, pipe or pipeline including but not limited to any pipe into a sewer or publicly owned treatment works, well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft;

          B.   any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located;

       2.   The term "owner or operator" means:

          A.   Any person owning or operating a vessel or facility;

        \*         \*         \*

22.   The Defendant Park District is an owner of a facility as that term is defined in Section 22.2(h)(2)(A) of the Act, 415 ILCS 22.2(h)(2)(A) (2006).

23.   The Defendant BFINA is an operator as that term is defined in Section 22.2(h)(2)(A) of the Act, 415 ILCS 22.2(h)(2)(A) (2006).

24.   The Defendants or their predecessors are "persons" as that term is defined in Section 3.315 of the Act, 415 ILCS 5/3.315 (2006).

25.   The Site constitutes a "facility" as that term is defined

-7-

in · Section 22.2(h)(1)(A) and (B) of the Act, 415 ILCS 5/22.2(h)(1)(A) and (B) (2006).

26. The contaminants detected in the groundwater from the Site are "hazardous substances" within the meaning of Sections 22.2(f) and 3.215 of the Act, 415 ILCS 5/22.2(f) and 5/3.215 (2006).

27. The spilling, leaking, discharging, depositing, disposing, placing or otherwise locating hazardous substances at the Site, and the release of hazardous substances from the Site to groundwater constitute a "release" within the meaning of Sections 22.2(f) and 3.395 of the Act, 415 ILCS 5/22.2(f) and 5/3.395 (2006).

28. The Illinois EPA has engaged in the remediation and removal of released hazardous substances from the environment at the Site, including such actions as were necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances and as were necessary to prevent, minimize or mitigate damage to the public health or welfare or the environment which may otherwise result from the release and threat of release of hazardous substances at the Site.

29. The remediation and removal of released hazardous substances by the Illinois EPA at the Site constitutes "remedial action" or "removal" within the meaning of Sections 3.400, 3.405 and

22.2(f) of the Act, 415 ILCS 5/3.400, 5/3.405 and 5/22.2(f) (2006).

30.    Plaintiff has incurred certain costs in connection with the removal and remedial actions, including but not limited to, soil and groundwater sampling, investigation and administrative expenditures, and other actions necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances and minimize or mitigate damage to the public health or welfare or the environment related to the release or substantial threat of release from the facility.

31.    The Defendants, as persons who owned or operated a facility from which there is a release or a substantial threat of a release of hazardous substances, are liable pursuant to Section 22.2(f) of the Act, for all costs of removal and remedial action incurred by the State of Illinois as a result of the release or substantial threat of release of hazardous substances at the Site.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests the Court to enter an order in favor of Plaintiff and against the Defendants, and each of them, and grant the following relief:

1.    Finding that the Defendants are liable for costs of removal or remedial action incurred by the Plaintiff pursuant to Section 22.2(f) of the Act;

2.    Assessing liability for all removal and remedial action costs incurred by the Plaintiff;

-9-

3.    Assessing all costs of this proceeding pursuant to Section 42(f) of the Act, including expert witness and attorney fees, against the Defendants; and

4.    Granting such other relief as the Court deems just and equitable.

## COUNT II - WATER POLLUTION

1.    This Count is brought by the Attorney General on her own motion pursuant to the terms and provisions of Section 42 (d) and (e) of the Act, 415 ILCS 5/42 (d) and (e) (2006), against the Defendant Rockford Park District.

2.    The Attorney General is the chief legal officer of the State of Illinois and has the powers and duties prescribed by law pursuant to Article 5, Section 15 of the Illinois Constitution, IL. CONST. 1970, art V, § 15.  The Attorney General has the duty to represent the People of the State of Illinois and all State agencies.  The Attorney General also has the obligation and authority to represent the People so as to ensure a healthful environment for citizens of the State.  Thus, this complaint is brought pursuant to the power of the Attorney General to institute an action on behalf of People of the State of Illinois.

3-17.    Plaintiff realleges and incorporates by reference herein paragraphs 2 and 3 and paragraphs 5 through 17 of Count I as paragraphs 3 through 17 of this Count II.

18.    Section 12(a) of the Act, 415 ILCS 5/12(a) (2006),

provides as follows:

> No person shall:
>
> a.    Cause or threaten or allow the discharge of any
>        contaminant into the environment in any State
>        so as to cause or tend to cause water pollution
>        in Illinois, either alone or in combination
>        with matter from other sources . . .

19.    Section 3.165 of the Act, 415 ILCS 5/3.165 (2006),
defines contaminant as:

> "CONTAMINANT" is any solid, liquid, or gaseous
> matter, any odor, or any form of energy, from
> whatever source.

20.    VOCs, benzene, chlorobenzene, napthalene, toluene,
ethylbenzene, vinyl chloride and xylene are contaminants as that
term is defined in Section 3.165 of the Act.

21.    Section 3.545 of the Act, 415 ILCS 5/3.545 (2006),
defines "water pollution" as follows:

> "WATER POLLUTION" is such alteration of the
> physical, thermal, chemical, biological or
> radioactive properties of any waters of the
> State, or such discharge of any contaminant
> into any waters of the State, as will or is
> likely to create a nuisance or render such
> waters harmful or detrimental or injurious to
> public health, safety or welfare, or to
> domestic, commercial, industrial, agricultural,
> recreational, or other legitimate uses, or to
> livestock, wild animals, birds, fish, or other
> aquatic life.

22.    Section 3.550 of the Act, 415 ILCS 5/3.550 (2006),
defines "waters" as follows:

> "WATERS" means all accumulations of water,
> surface and underground, natural, and
> artificial, public and private, or parts

thereof, which are wholly or partially within, flow through, or border upon this State.

23. The groundwater underlying the Site is a water of the State of Illinois as that term is defined in Section 3.550 of the Act, 415 ILCS 5/3.550 (2006).

24. By causing, threatening or allowing the release of VOCs, benzene, chlorobenzene, napthalene, toluene, ethylbenzene, vinyl chloride and xylene at the Site which subsequently entered the groundwater underlying the Site, Defendant Park District, caused, threatened or allowed the discharge of a contaminant into the environment.

25. By causing, threatening or allowing the discharge of a contaminant into the environment, Defendant Park District, caused or tended to cause water pollution in Illinois.

26. By causing or tending to cause water pollution in Illinois, Defendant, Park District, thereby violated Section 12(a) of the Act.

27. Plaintiff is without an adequate remedy at law. Plaintiff will be irreparably injured and violations of the relevant environmental statutes and regulations will continue unless and until this court grants equitable relief in the form of preliminary and, after trial, permanent injunctive relief.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this court enter an order granting a

- 12 -

preliminary injunction and, after trial, a permanent injunction, in favor of Plaintiff and against Defendant Rockford Park District on this Count II:

1.    Finding that Defendant Rockford Park District violated 415 ILCS 5/12(a) (2006);

2.    Enjoining Defendant Rockford Park District from any future violations of 415 ILCS 5/12(a) (2006);

3.    Ordering Defendant Rockford Park District to take the appropriate corrective action that will result in the abatement of the violations alleged herein;

4.    Assessing against Defendant Rockford Park District, pursuant to 415 ILCS 5/42(a) (2006), a civil penalty of Fifty Thousand Dollars ($50,000.00) for each and every violation of the Act, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day during which each violation continued;

5.    Assessing against Defendant Rockford Park District all costs including attorney, expert witness, and consultant fees expended by the State in its pursuit of this action; and

6. Granting such other relief as this court deems appropriate and just.

PEOPLE OF THE STATE OF ILLINOIS,
*ex rel.* LISA MADIGAN,
Attorney General of the
State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos
  Litigation Division
Assistant Attorney General

By: _____
    RoseMarie Cazeau, Chief
    Environmental Bureau

*OF COUNSEL:*
Gerald T. Karr
Senior Assistant Attorney General
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, IL 60602
(312) 814-3369

- 14 -